**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Joshua A. LEVINE, Defendant–Appellant.**

**No. 94–50588.**

United States Court of Appeals, Fifth Circuit.

March 28, 1996.

Michael C. Gross, Jack B. Zimmermann, Zimmermann & Levine, Houston, TX, for Appellant.

Richard L. Durbin, Jr., Asst. U.S. Atty., James H. DeAtley, Act. U.S. Atty., San Antonio, TX, for Appellee.

Before GARWOOD, SMITH and DENNIS, Circuit Judges.

DENNIS, Circuit Judge.

A jury found Joshua A. Levine guilty of robbing a bank with a firearm. On appeal, Levine objects to the admission of evidence he contends was seized as a result of his allegedly illegal arrest and search. Levine alleges the district court erroneously admitted opinion testimony in violation of Federal Rules of Evidence 704(b). He also alleges the district court abused its discretion by failing to immediately correct the misstatements of law made by the prosecutor during closing arguments.

## I.

On August 17, 1993, Joshua Alan Levine robbed an Austin, Texas bank at gun point. He timed the robbery to occur just prior to the arrival of the bank's security guard, when business was routinely slow. He wore a mask and gloves and carried a 9mm pistol and money bag.

He entered the bank through the back door, and in a harsh tone ordered two tellers to give him money. The tellers complied but also added two packets of "bait money," each planted with an electric transmitter. The transmitters were part of an electronic tracking system, a joint effort by the Austin police and local financial institutions to apprehend robbers. As Levine hurried out of the bank, he spilled much of the money from his bag, including one of the packets of bait money. The second packet remained inside the bag.

About forty minutes after the robbery, Officer Shelley Gutherie picked up a signal with his vehicular tracking unit indicating movement north on Interstate–35. Gutherie followed the signal until he eliminated all suspected vehicles except Levine's car. He followed Levine into a parking lot and pulled in at an angle beside Levine's car.

Gutherie confirmed that he had received information that a white male between 5′6″ and 5′8″ had participated in an armed robbery of a downtown bank, and that information played a part in how he decided to approach Levine. As Levine was getting out of the car, Gutherie stepped out with his gun drawn and told Levine to freeze. Gutherie told Levine to put his hands on the roof of his car. When Levine dropped one hand to his pocket, Gutherie rushed him yelling at him to get his hand out of his pocket. Gutherie then frisked Levine and handcuffed him. Another officer arrived, took Levine to his car, and read him his *Miranda* rights.

Gutherie then began to scan Levine's car with his hand-held detector. The detector gave a strong signal toward the back of the car. After a search of the back seat revealed nothing, Gutherie used Levine's car keys and opened the trunk. There he found a pair of ski goggles, a mask, a loaded 9mm pistol, and extra ammunition clip, and the bait money. He also found three journals containing detailed plans of a bank robbery. Gutherie located the transmitter and disengaged it.

An agent for the Federal Bureau of Investigation subsequently interviewed Levine. He confessed to the crime describing its execution and his subsequent flight, saying he bought the gun a month earlier and the mask and gloves the night before the crime. He also provided a motive, gambling debts of about $3,500. He appeared calm, lucid, and rational during the interview.

At trial, Levine presented a temporary insanity defense. Two of Levine's expert witnesses, a psychiatrist and a psychologist, testified that Levine suffered from bipolar disorder, previously known as "manic depressive" illness. They stated that a person with this illness experiencing a severe manic episode would not be able to appreciate the nature and quality of his conduct. In rebuttal, the Government offered testimony of a psychologist who stated he believed Levine was not suffering bipolar disorder at the time of the robbery, because Levine's organization in planning and executing the robbery including his use of disguise and actions to conceal the clothing after the robbery, his lucidity

and coherence answering questions shortly after the robbery, and his conversation with this psychiatrist regarding his earlier plans to rob the bank were not consistent with the actions of someone suffering a manic episode of bipolar disorder.

A jury convicted Levine on two counts: (1) bank robbery, in violation of 18 U.S.C. § 2113(a) and (d); and, (2) using a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1). The district court sentenced Levine to 106 months in prison, the first forty-six months for the bank robbery and the remaining sixty months for the use of a firearm during the bank robbery. The court also imposed a five year term of post imprisonment supervised release for the bank robbery, and a concurrent term of three years of supervised release for the firearms offense.

II

Levine argues that the district court committed reversible error by denying his motion to suppress evidence. He identifies three actions taken by the police, each of which he contends constitutes a violation of his constitutional protections under the Fourth Amendment: 1) the warrantless arrest; 2) the warrantless search of Levine's person; and, 3) the warrantless search of the trunk of Levine's car. Levine concedes the signal from the transmitter in his car gave Officer Gutherie sufficient justification to stop the car. Levine contends, however, that the signal did not give Officer Gutherie probable cause to proceed with a warrantless arrest and subsequent warrantless search of his person and vehicle.

■ This Court's standard of review for a motion to suppress based on live testimony at a suppression hearing is to accept the trial court's factual findings unless clearly erroneous or influenced by an incorrect view of the law. *U.S. v. Piaget*, 915 F.2d 138, 139 (5th Cir.1990). Evidence is viewed in the light most favorable to the prevailing party, in the case at bar, the Government. *Id.* at 140.

■ A warrantless arrest must be based on "probable cause." Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense. *United States v. Wadley*, 59 F.3d 510, 512 (5th Cir.1995). The presence of probable cause is a mixed question of fact and law. *Id.* at 512. This Court will not disturb the factual findings of the district court absent clear error. Accepting these facts, the ultimate determination of whether there is probable cause for the arrest is a question of law to be reviewed de novo. *Id.* at 512.

■ The district court found that the determination of probable cause rested on the reliability of the electronic tracking system. Officer Gutherie testified at the suppression hearing that the signal emitted from Levine's car was the sole factor he relied upon to stop Levine's car. He testified that from his eight years experience using the system, he was certain that the transmitter was located in the car he stopped. However, Levine contended the system was unreliable because evidence at trial showed the towers received simultaneous signals from different parts of the city during the chase.

The tracking system included a network of remote tower antennae, mobile tracking units in police vehicles, and hand-held detectors. Officer Brown, an investigator on the Robbery Detail of the Austin Police Department, testified at the suppression hearing about the tracking system in place during the robbery. He said the battery inside the remote transmitter lasted between two and four hours. After an alert was picked up by a tower, approximately thirty patrol units were assigned to search for the signal. Each vehicle was sent to a designated area to attempt to pick up the signal because the receiving radius per vehicle was less than one mile.

Brown testified that each vehicular tracking unit had a control panel with a directional meter and a series of red lights and included an audio signal. As the police vehicle approached a radio transmitter, the audio increased and the number of lights activated on the control panel increased. Also, the directional meter pointed in the direction of the transmission, indicating left and right

turns. Brown stated that the system had been in effect since 1985. He estimated its success rate locating stolen money to be between 95–97 percent, stating that the only time it failed was when the alleged robber located the transmitter or accidentally discarded it. Brown also testified that the system has a built-in self-test to inform the officers it is operating correctly. He said officers periodically conducted practice tests where the device was activated and the officers practiced finding it.

Brown testified that on the morning of the robbery in question, the tracking system was alerted when the tellers removed the bait money from the drawers, activating two subminiature radio transmitters. Simultaneous signals were received in different parts of the city because one tracking device remained at the bank while the other traveled around the city with Levine as he made stops to discard clothing before proceeding to Interstate–35. The towers picked up both signals until each device was located and deactivated.

Officer Gutherie testified at the suppression hearing that he was on duty when he received the robbery alert. He picked up a north bound signal on Interstate–35 that became stronger as he followed vehicles traveling north. When his tracking unit indicated the signal had moved to the right, Gutherie observed two vehicles, a van and a red car, moving right. He continued to follow the vehicles as they exited the freeway. At this point, his tracking device indicated he was directly behind the signal. At an intersection the van turned, but the signal did not indicate a turn. Gutherie, therefore, continued to follow the red car as in front of his as the signal approached maximum intensity on his monitor. The red car turned into a parking lot, also indicated on Gutherie's monitor, further confirming his determination he was following the car carrying the transmitter. Gutherie testified he had experience using the system both in practice runs and tracking other robbery suspects.

The district court found that the signal provided Officer Gutherie with reasonable belief that Levine was connected to an armed robbery in which the electronic device emitting the signal had been taken only forty minutes before the arrest. The court concluded Officer Gutherie had "probable cause" to believe Levine's car contained the money tied to the robbery, justifying the search of the car. Furthermore, the court concluded that the same probable cause was sufficient for the arrest and search of the person who was driving the car containing the electronic tracking device and the stolen money.

This Court has not yet determined if the use of an electronic signal alone may constitute a sufficient basis for probable cause for a warrantless arrest. However, a dog alert for narcotics, alone, has been found to be sufficient to support probable cause for a warrantless arrest. *United States v. Williams*, 69 F.3d 27, 28 (5th Cir.1995); *See also United States v. Mendez*, 27 F.3d 126, 130 n. 5 (5th Cir.1994) (citing other circuits recognizing that a dog sniff alone supports probable cause.). The electronic tracking device in use during this particular robbery was at least as reliable as a dog's nose. The only alleged inaccuracy in the system—dual signals—was simply the system's accurate monitoring of the two activated transmitters located in the money packet that fell out of Levine's bag at the bank and the other packet that traveled in Levine's car trunk as he drove to various parts of the city. The district court did not err finding that in this case, the electronic tracking device constituted a sufficient basis for probable cause to support Levine's arrest.

Furthermore, Officer Gutherie's subsequent warrantless search of Levine's car parked in the public parking lot was justified because this Court has concluded that "probable cause *alone* suffices to justify a warrantless search of a vehicle lawfully parked in a public place, as long as the scope of the search is reasonable." *United States v. Sinisterra*, 77 F.3d 101, 104 (5th Cir.1996), citing *United States v. Cooper*, 949 F.2d 737, 747 (5th Cir.1991) (emphasis in original). Officer Gutherie's search of Levine's car and then locked trunk was reasonable because the officer's tracking devices indicated the electronic beeper and bait money was located in that area of Levine's car. Therefore, Officer Gutherie's immediate and thorough search of Levine's car was not unconstitutional.

### III

Levine argues that the district court erred by admitting opinion testimony from the Government's expert psychologist who answered hypothetical questions that tracked the facts in the case. Levine contends that the "thinly veiled" hypotheticals posed by the prosecutor elicited from the expert an opinion or inference as to an ultimate issue in the case in violation of Federal Rules of Evidence 704(b). The Government responds that the hypothetical questions properly elicited information from the expert exploring whether behavior such as that exhibited by Levine at the time of the robbery was consistent with behavior of a person diagnosed with bipolar disorder experiencing a severe manic episode.

■ This Court reviews a trial judge's admission of evidence for abuse of discretion. *United States v. Speer,* 30 F.3d 605, 609 (5th Cir.1994). Federal Rule of Evidence 704(b) states, "No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone."

■ In a case where the defendant asserts the affirmative defense of insanity, the ultimate issue is whether at the time of the crime the defendant "appreciated the nature and quality or the wrongfulness of his acts." *United States v. Dotson,* 817 F.2d 1127 (5th Cir.1987), *opinion on rehearing,* 821 F.2d 1034 (5th Cir.1987). In the case at bar, Levine raised the defense of insanity at trial and presented expert testimony that at the time of the robbery Levine suffered from a severe mental disease known as bipolar disorder. To rebut the testimony of Levine's expert witness, the Government offered expert testimony from a clinical psychologist whose opinion was that Levine was not suffering from bipolar disorder during the time of the robbery.

■ During redirect examination of the Government's expert, the prosecutor asked several hypothetical questions closely mirroring the events of the bank robbery. The defendant's objections to the following two questions, and two others similar to these, were overruled by the trial court:

Q. Do you think that someone that was suffering from a severe manic episode when they paused outside that bank would have the wherewithal in their mind to think before they went in to put on their disguise?

[Objection raised and overruled].

A. No, in a severe manic episode, no, I don't.

Q. Do you think that an individual suffering from a severe manic episode, after going into the bank, would think about getting out quickly before the guard arrived?

A. No, I don't … [objection raised and overruled] … No, I don't think a person suffering from a severe manic episode would do that.

In oral argument, counsel for the defendant acknowledged that it is permissible to question the expert about whether acts tracking the fact pattern of the trial case are consistent with characteristics of a person experiencing a manic episode. However, he argues that the government "went one step too far" by asking the expert if a person experiencing a manic episode would "think to act" in such manner. Levine's counsel contends these questions refer to the intent of the defendant and that Rule 704(b) prohibits an expert's opinion as to Levine's intent during the crime.

The issue of admissibility of expert testimony on hypotheticals tracking the facts of the case has not been extensively discussed by this circuit. The majority opinion in other circuits appears to be that under Rule 704(b) hypothetical questions mirroring the fact patterns of the evidence in the trial case are violative of the rule when the answering testimony contains a necessary inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. *See e.g. United States v. Boyd,* 55 F.3d 667, 669 (D.C.Cir.1995); *United States*

*v. Dennison,* 937 F.2d 559, 565 (10th Cir. 1991), *cert. denied,* 502 U.S. 1037, 112 S.Ct. 886, 116 L.Ed.2d 789 (1992); *United States v. Manley,* 893 F.2d 1221, 1223–24 (11th Cir. 1990); *cf. United States v. Cook,* 53 F.3d 1029, 1031 (9th Cir.1995).

The expert's answers to the four questions posed by the government did not contain an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or a defense thereto. Instead, the expert's testimony focused on whether facts similar to those in evidence were consistent with the conduct of a hypothetical person suffering a severe manic episode. Consequently, the expert's testimony fell within permissive bounds of Rule 704(b), and the district court did not abuse its discretion by overruling the defendant's objections based on Rule 704(b) and admitting the expert's testimony.

## IV

Levine next argues that the Government misstated the law during closing arguments, an error he contends deprived him of his Fifth Amendment right to due process and his Sixth Amendment right to a fair trial. He further contends that this error was not cured by the written instruction given by the district court mid-way through the deliberations. His objection is not to the substance of the written instructions submitted to the jury by the court, but rather to the timing of the charge—that it was issued to the jury too late to avoid affecting his Fifth and Sixth Amendment rights. At oral argument, the Government acknowledged its misstatement but argues the misstatement was only a brief part of closing argument and was cured by subsequent actions of the court.

■ There are three factors for the appeals court to consider in deciding whether to reverse the defendant's conviction due to improper prosecutorial argument. These factors are: 1) the magnitude of the prejudicial effect of the statements; 2) the efficacy of any curative instruction; and, 3) the strength of the evidence of the defendant's guilt. *United States v. Casel,* 995 F.2d 1299,

1308 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1308, 127 L.Ed.2d 659 (1994).

At the end of the Government's closing argument, the prosecutor stated that if the jury "buys [Levine's] insanity defense", Levine will "walk out of this courtroom a free man." Defense counsel objected and requested the court to correct the misstatement by immediately issuing a curative instruction to the jury. The court overruled the objection, but orally admonished the jury to follow the instructions given them by the court and not to be concerned "with the consequences of the verdict. Your responsibility is to return a verdict on the evidence based on the instructions that I've given you."

In his closing arguments, counsel for Levine told the jury that the law provided if a person commits a criminal act when, as a result of a severe mental defect, he is not able to appreciate the nature and quality of his act, that person is to be dealt with by the medical system not by the prison system. Again while the jury deliberated, defense counsel repeated his request for an instruction to the jury regarding the effect of a verdict of not guilty by reason of insanity. After taking the matter under advisement, the court agreed and submitted a written supplementary jury instruction to which defense counsel had no "substantial objection." Twice afterwards, before returning the guilty verdict on both counts, the jury asked the court by note for clarifications of other parts of the insanity defense.

■ An instruction concerning the consequences of a verdict of not guilty by reason of insanity is not to be given as a matter of general practice. *Shannon v. United States,* —— U.S. ——, ——, 114 S.Ct. 2419, 2428, 129 L.Ed.2d 459 (1994). However, if a prosecutor states in the presence of a jury that a particular defendant would "go free" if found not guilty by reason of insanity, the Supreme Court has recognized that an instruction of some form "might be necessary." *Id.* at ——, 114 S.Ct. at 2428.

■ In the present case, the prejudicial effect of the prosecutor's misstatement was minimized by the two instructions by the

court, the oral admonishment and the written supplemental instructions. The jury is presumed to have followed the court's instructions. *United States v. Willis,* 6 F.3d 257, 263 (5th Cir.1993).

Furthermore, the defendant's objection is not that the misstatement is so egregious that it could not have been cured, or that the language of the written cure was not sufficient, only that the cure was not timely. After the court submitted the curative written instructions, the jury sent out two notes requesting further clarification of the insanity defense. The first note requested clarification of the standard and the second note requested clarification of the meaning of "quality and nature." The notes indicate that the instructions were given in time to provide corrective guidance to the jury. Therefore, the instructions were not too late to provide curative effects safe guarding the defendant's Fifth and Sixth Amendment rights to due process and a fair trial.

■ Finally, there was strong evidence of the defendant's guilt. In spite of the multiple diagnoses of the defendant's expert witnesses that Levine suffered bipolar disorder, Levine's actions leading up to, during, and after the robbery indicated he was aware of the nature and wrongfulness of his conduct. Considering all of these factors, we conclude that the effects of the prosecutor's misstatement were either eradicated or ameliorated to the extent that they were harmless.

## Conclusion

Accordingly, the judgment of conviction and sentence is AFFIRMED.