REVISED

# UNITED STATES COURT OF APPEALS
## For the Fifth Circuit

---

### No. 95-21094

---

**UNITED STATES OF AMERICA,**

Plaintiff-Appellee,

**VERSUS**

**PEDRO ELIZONDO GARZA; JORGE INOCENCIO; HOMERO HINOJOSA GARCIA; OZIEL ALANIS,**

Defendants-Appellants.

---

Appeals from the United States District Court
For the Southern District of Texas

---

July 16, 1997

Before POLITZ, Chief Judge, DeMOSS, Circuit Judge, and DOHERTY,[1] District Judge.

DeMOSS, Circuit Judge:

A jury convicted the defendants, Jorge Inocencio, Pedro Elizondo Garza, Homero Hinojosa Garcia, David Tovar[2] and Oziel Alanis, of conspiracy to possess with intent to distribute more than five kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 846. Tovar and Oziel were convicted on

---

District Judge of the Western District of Louisiana, sitting by designation.

Tovar died on August 12, 1996, and his cause has been dismissed by order of this Court.

other counts of aiding and abetting the possession of cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 18 U.S.C. § 2. Inocencio, Garza, and Garcia were also convicted of money laundering under 18 U.S.C. §§ 1956(a)(1)(A)(i)and 1956(g). The defendants appeal from the judgments of conviction entered and sentences imposed by the district court following a jury trial. After reviewing the record, we find that insufficient evidence exists to support the money laundering conviction as to Garza and Garcia. As to all other convictions and sentences, finding no error, we affirm.

**BACKGROUND**

On January 26, 1995, based on information supplied from a prior investigation, law enforcement officers set up surveillance on Garcia and Garza at a Days Inn in Houston, Texas. Houston Police Officer Jerry Nimmo observed Garcia seated in a red Buick Regal which was parked on a curb near the entrance to the Days Inn parking lot. Garcia appeared to be waiting for someone and conducting counter surveillance. Garza approached the Buick, entered the driver's side of the car, and drove down the road. Garza then stopped the car and Garcia got out, looked around, and reentered the car. Garza then made a u-turn and drove back to the Days Inn.

Garza then entered the motel while Garcia waited in the back seat of the Buick. Thereafter, Garza reappeared carrying a tan sports bag. Tovar walked toward the Buick with Garza. Garza

placed the sports bag on the driver's side floorboard. Officer Nimmo then observed the three defendants conversing outside their vehicles. Tovar then turned and walked back to a black Camaro. Garza and Garcia left in the Buick. Tovar followed in the Camaro.

Garza and Garcia drove to an apartment complex and made two "heat runs" before entering the complex. Tovar headed toward the interstate. The Buick parked in front of apartment 2142, which was later found to be Tovar's apartment. Garza then drove the Buick to a "J.D. Sales" store in Pasadena, Texas. He was seen making two "heat runs" past the store before returning. Garza then drove the Buick to Mavis Lane in Pasadena where observation of the Buick ended. A surveillance perimeter was established around the neighborhood.

Officers saw Garza and Garcia again that afternoon in a blue Chrysler New Yorker. Garza and Garcia stopped in a Texaco gas station and used a pay phone at that location. Sometime thereafter, Inocencio arrived at the Texaco in a black Mercury Marquis. Inocencio pulled up next to the Chrysler and handed a green field jacket to Garcia. The two cars then left in opposite directions.

Around 3:00 p.m., the Chrysler pulled into a Conoco gas station. Garza used the pay phone and made a "pager type" call and then left the gas station. Officers stopped the Chrysler at 3:20 p.m. in the 3800 block of Spencer Highway in Pasadena. Speaking in Spanish, Sergeant Pohlman identified himself and ordered Garza and Garcia to raise their hands. Garcia kept lowering his hands,

3

forcing the officer to reach inside the vehicle and place his hands across Garcia's elbows. The officer saw a 9mm pistol between Garcia's leg and the arm rest and seized the gun from the car. Garza and Garcia then exited the vehicle and Officer Bell advised them in Spanish that they were being investigated and that the officers wanted to speak with them.

During questioning, Garza told Officer Bell that he was not acquainted with anyone owning a black Camaro and that he had just purchased a pickup from J.D. Sales. Garza then read and signed a consent form to search the Chrysler. Police found a loaded .40 caliber Smith & Wesson pistol inside the green jacket Inocencio had handed Garcia. A telephone address book was also seized.

Meanwhile, outside the Mavis Lane residence of Inocencio, Police stopped Inocencio and explained that they were conducting a narcotics investigation and asked if they could question him inside the residence. Inocencio invited the officers inside. Inocencio first orally consented to a search of the premises and then signed a consent form to search the house. Police discovered 104 kilograms of cocaine in packages with labels of joker cards and a "red ace of clubs" concealed in luggage in attic space next to an upstairs bedroom.[3] Officers also found approximately $5 million in cash as well as ledgers and notebooks documenting drug transactions. The ledgers and notebooks indicated that 609 kilograms of cocaine had been sold for approximately $7,964,000, of

---

We are aware of the fact that clubs are traditionally black cards; but the record is clear that red was the color in this case.

which $6,189,000 had been received. Officers also found scales, a Smith & Wesson box with the same serial number as the gun found between Garza and Garcia in the Chrysler, an adding machine with adding machine tape, and loaded handguns and ammunition.

Around 4:00 p.m., officers stopped Tovar, Oziel, and another man in a Lincoln Town Car. After much consternation, Tovar consented to a search of his car and his apartment. In the car, officers found one kilogram of cocaine labeled with a red ace of clubs in a potato chip bag under the front passenger-side seat and $2,285 in cash in the glove box. In Tovar's apartment, officers discovered approximately 6 kilogram-sized packages of cocaine labeled with a red ace of clubs, two stolen loaded handguns, a lathe used to design silencers, silencers, silencer parts, and a digital scale. A date book and address book were also seized.

Inocencio, Garcia, Garza, Tovar, and Oziel were charged in Count One of a four count indictment with conspiracy to possess cocaine with intent to distribute. Count Two charged Inocencio, Garcia, and Garza with aiding and abetting persons to knowingly and intentionally possess with intent to distribute more than 5 kilograms of cocaine. Count Three charged Tovar and Oziel with aiding and abetting persons to knowingly and intentionally possess with intent to distribute more than 5 kilograms of cocaine. Count Four charged Inocencio, Garcia, and Garza with knowingly and willfully attempting to launder money in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and 1956(g).

A jury found the defendants guilty on all counts in the

5

indictment.  The district court sentenced Inocencio to 365 months imprisonment.  Garcia received 405 months and Garza was sentenced to 365 months.  The defendants filed timely notices of appeal.

**ANALYSIS**

*1. The Search of Inocencio's Home*

On appeal, Inocencio contends that the district court erred in denying his motion to suppress the warrantless search of his home. Inocencio contends that law enforcement officers arrived at his residence and asked if they could question him.  Because Inocencio does not adequately speak nor understand English, one officer questioned him in Spanish.  The Spanish speaking officer testified that Inocencio verbally consented to a search of his home.  The officer then asked Inocencio to sign a written consent form which, in Spanish, explained his right to refuse consent.  Inocencio signed the form.

The form states in pertinent part "Persona, Premisas o Transporte a ser examinado."  Expert testimony revealed that the form was incorrectly translated from English to Spanish.  The English version of this caption stated "person, premises or conveyance to be search."  In the translation to Spanish, the word "premises" was changed to "premisas" which, in Spanish, means "logical proposition" or "the premise of the argument."  Testimony revealed that "premisas" does not refer to premises or relate to a home or residence.  Further, officers only filled out Inocencio's name under the heading.  They did not fill-out the space for place,

6

or conveyance to be searched.

According to Inocencio, this omission suggests that he was only to be subject to an "examinado." In support, he contends that the written form uses the verb "examinar" which means to examine. Inocencio maintains that he thought this "examination" would be oral and did not understand that he had consented to a "catear" or "registrar," two words which correctly translate to the verb "search" in English. Inocencio also testified that he did not understand that his oral consent to search included his home. He stated that he only agreed to a search of his person and his automobile. As such, he maintains that the search of his residence was improper.

We review a motion to suppress based on live testimony at a suppression hearing for clear error, viewing evidence in the light most favorable to the prevailing party, in this case, the government. *See United States v. Levine*, 80 F.3d 129, 132 (5th Cir.), *cert. denied*, 117 S. Ct. 83 (1996); *United States v. Piaget*, 915 F.2d 138, 139-140 (5th Cir. 1990). The district court based its decision on the following findings and conclusions:

> The fact that the Spanish translation of the consent form contained an incorrect translation of the word "premises" does not invalidate the consent given by Inocencio. Given that Inocencio testified that he never read the form, and given the statements made to him by Officer Bell, Inocencio's act of signing the document signifies to the Court that Inocencio intended to memorialize what the defendant had previously agreed to when he verbally consented to the search of the Mavis residence.

The district court heard testimony from Inocencio that he had been living in the United States since 1978. Further, Inocencio

7

testified that he never read the consent to search form. The district court also heard testimony from the officers and Inocencio about Inocencio's verbal consent to search of his home.

After reviewing the record, we find no clear error with the district court's decision. The fact that the consent form was incorrectly translated is irrelevant given that Inocencio never read the form and could not have mistakenly relied on its translation. As such, this case turns on whether oral consent to search was given by Inocencio. In making this determination, the district court was in the best position to weigh the credibility of the testimony of Officer Bell and Inocencio and ascertain that Inocencio did understand that he gave oral consent to search his home. We will not second guess the district court's factual findings as to the credibility of witnesses. *See **United States v. Botello***, 991 F.2d 189, 194 (5th Cir. 1993); ***United States v. Coburn***, 876 F.2d 372, 374 (5th Cir. 1989). Further, we will not disturb findings of fact unless we are left with the definite and firm conviction that a mistake has been made. *See **Botello***, 991 F.2d at 194. Once the officers obtained oral consent to search Inocencio's home, the search was valid, notwithstanding the incorrectly translated consent form.

*2. Sufficiency of the Evidence - Drug Convictions*

"In reviewing an appeal based on insufficient evidence, the standard is whether any reasonable trier of fact could have found that the evidence established the appellant's guilt beyond a

8

reasonable doubt." *United States v. Jaramillo*, 42 F.3d 920, 922–923 (5th Cir. 1995). We consider evidence in the light most favorable to the verdict. *See id.* at 923.

To establish a violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A), the government must prove that the defendants (1) knowingly (2) possessed narcotics (3) with intent to distribute. *See United States v. Skipper*, 74 F.3d 608, 611 (5th Cir. 1996). "Possession may be either actual or constructive and may be joint among several people." *Id.* Possession may also be proven by direct or circumstantial evidence. *See United States v. Ojebode*, 957 F.2d 1218, 1223 (5th Cir. 1992).

### A.  Garza and Garcia

Garza and Garcia contend that the government failed to establish that they joined or furthered the purpose of this conspiracy. They argue that the government presented no evidence other than their mere presence and association with the narcotics found in connection with Inocencio and Tovar. We disagree.

Garza and Garcia participated in counter surveillance before rendezvousing with Tovar at the Days Inn and en route to Tovar's apartment and Inocencio's house. Garza and Garcia met with Tovar, whose apartment and car contained narcotics. The packages of cocaine found in Tovar's car and residence had the same label as the packages found in Inocencio's home. Garza and Garcia also met with Inocencio at a Texaco gas station where Inocencio gave them a green jacket with a firearm. Inocencio also told officers during

9

questioning that Garza and Garcia were staying at his home. Garcia's fingerprints were found on drug ledgers and adding machine tapes in Inocencio's home. Garcia's fingerprints were also found on one of the boxes containing money found inside Inocencio's residence. Garcia carried Inocencio's pager number. Finally, officers found two firearms in the car occupied by Garza and Garcia.

Based on this evidence, the government clearly presented sufficient evidence to show that Garza and Garcia "`became associated with, participated in, and in some way acted to further the possession and distribution of drugs.'" *United States v. Inocencio*, 40 F.3d 716, 726 (5th Cir. 1994) (quoting *United States v. Chavez*, 947 F.2d 742, 745-46 (5th Cir. 1991)). Consequently, a reasonable jury could conclude that Garza and Garcia knowingly possessed cocaine with intent to distribute.

B.    Oziel

Oziel also contends that insufficient evidence exists to support his conviction. Oziel argues that his name on the drug ledgers found in Inocencio's residence, and his mere presence in Tovar's car, are the principal evidentiary pieces linking him to this conspiracy and, these facts alone, cannot support a conviction.

The government presented evidence that a notebook with a picture of a "Killer Whale" found at Inocencio's home had a written entry that Oziel received 25 kilograms of cocaine on the day he was

10

arrested.  Officers found cocaine with a label of the red ace of clubs and $2,285 in cash in the car occupied by Tovar and Oziel. Identically labeled packages of cocaine were found in Tovar and Inocencio's homes.  Oziel's fingerprints were found on a box containing two of the six kilograms of cocaine inside Tovar's home. Further, Oziel was a passenger in Tovar's car on the same day that Tovar met with Garcia and Garza.  Evidence also showed that Oziel entered the United States the day before his arrest.  This evidence, taken together could lead a reasonable jury to conclude that Oziel was in fact involved in this conspiracy.  As such, we hold that sufficient evidence exists to support his conviction.

*3.    Sufficiency of the Evidence - Money Laundering*

Garza and Garcia contend that insufficient evidence exists to support their convictions under 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(g) for money laundering.[4]  To secure a conviction for conspiracy to commit money laundering, the government must prove that the defendants knew of the conspiracy and voluntarily joined it.  **United States v. Ismoila**, 100 F.3d 380, 387 (5th Cir. 1996). As to money laundering, the government must prove that the defendants (1) knowingly conducted a financial transaction (2) that involved the proceeds of an unlawful activity (3) with the intent to promote or further that unlawful activity.  **United States v.**

---

Inocencio was also charged and convicted in Count IV of money laundering.  Inocencio did not raise the issue of whether sufficient evidence exists to support the money laundering conviction in his brief on appeal.  As such, we do not address the validity of his conviction on this count.

11

*Thomas*, 12 F.3d 1350, 1360 (5th Cir. 1994).

Garza and Garcia maintain that the government has failed to show any agreement by them to engage in any financial transaction. Garza and Garcia also argue that, in fact, no evidence exists to show that a financial transaction occurred. According to Garza and Garcia, the only evidence identified by the government consists of storage of currency and cocaine at Inocencio's Mavis Lane residence. No proof of wire transfers or other transactions involving currency was presented.

After reviewing the record, we agree with Garza and Garcia. The government failed to present evidence of a financial transaction involving these defendants. A "financial transaction" pursuant to § 1956 is "a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments. . . ." 18 U.S.C. § 1956(c)(4)(A). "By definition, then, a `financial transaction' must, at the very least, be a `transaction,' i.e., `a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition' or some action involving a financial institution or its facilities." *United States v. Puig-Infante*, 19 F.3d 929, 938 (5th Cir. 1994) (citing 18 U.S.C. § 1956(c)(3)).

When some "transaction" that does not involve a financial institution or its facilities is charged, the government must show that a "disposition" took place. A "disposition" has been defined by this Court to mean "`a placing elsewhere, a giving over to the

12

care or possession of another.'" *Id.* (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, 654 (1961)). We also note that currency does not become proceeds of drug trafficking until a drug sale has been completed. *See* **United States v. Gaytan**, 74 F.3d 545, 555-56 (5th Cir.), *cert. denied*, 117 S. Ct. 77 (1996).

In this case, the government argues that "the collection of more than $11 million in less than a six week period of time, Oziel's presence from Mexico, and the presence of $5 million in drug proceeds support the inference of a disposition of the drug proceeds handled by Garcia and Garza and the inference of intent to commit money laundering . . . ." Notwithstanding this inference-filled expose!, currency found by officers in connection with a drug trafficking offense, by itself, is insufficient evidence to support a money laundering conviction. *See* **Puig-Infante**, 19 F.3d at 938; **United States v. Ramirez**, 954 F.2d 1035, 1039-40 (5th Cir. 1992).

The government presented evidence that $2 million in proceeds had been collected and forwarded to Colombian producers and a stockpile of $5 million in cash was found at Inocencio's residence. However, no evidence was presented that Garza or Garcia handled these proceeds or were, in any way, involved in the "disposition" of these funds. While the jury may draw reasonable inferences from the evidence presented, nothing reasonable could be inferred from this evidence. As such, we reverse Garza's and Garcia's convictions for money laundering and remand their cases to the district court for resentencing in light of this disposition.

*4.  Evidentiary Rulings*

Garza and Oziel contend that the district court abused its discretion by admitting extrinsic evidence of silencers and silencer-making materials found in Tovar's apartment in violation of FED. R. EVID. 404(b).  The government contends that this issue was not properly raised in the trial court and, therefore, should be reviewed only for plain error.  *See **United States v. Misher***, 99 F.3d 664, 670 (5th Cir. 1996).

Even if objections to the admission of this evidence were properly raised, we find no abuse of discretion with respect to its admission.  The silencers and silencer-making materials were found contemporaneously with the six kilograms of cocaine found in Tovar's apartment.  Firearms and silencers are deemed to be parts of the tools-of-the-trade of drug trafficking and are relevant intrinsic proof of an ongoing conspiracy.  As such, this evidence tends to show that the defendants were involved in a major drug trafficking conspiracy complete with a number of firearms and silencers.

Additionally, the district court properly determined that the probative value of the evidence was not substantially outweighed by its potential prejudicial effect.  FED. R. EVID. 403.  Danger of prejudice is always present.  Consequently, exclusion of extrinsic evidence based on its prejudicial effect "should occur only sparingly."  *See **United States v. Leahy***, 82 F.3d 624, 637 (5th Cir. 1996) (quoting ***United States v. Pace***, 10 F.3d 1106, 1115 (5th Cir.

14

1993)).  Finding no abuse of discretion, we affirm the decision of the district court to admit evidence of the silencers and silencer-parts discovered in Tovar's apartment.

*5.    Sentencing Issues*

Oziel contends that the district court erred in enhancing his base offense level by two levels for possession of firearms pursuant to United States Sentencing Guidelines (U.S.S.G.) § 2D1.1(b)(1).  Section 2D1.1(b)(1) provides for a two-level increase to the base offense level if a dangerous weapon was possessed during the commission of a drug trafficking offense.  Oziel argues that he did not possess a firearm and that he had no knowledge of the firearms that were recovered.  He further asserts that it was not foreseeable that his co-defendants would possess firearms, especially in light of that fact that he arrived in Houston from Mexico only 48 hours before his arrest.

We review a district court's decision to apply § 2D1.1(b)(1) for clear error.  *See* **United States v. Rodriguez**, 62 F.3d 723, 724 (5th Cir. 1995).  Although a conviction on a substantive count requires proof beyond a reasonable doubt, the district court may sentence a defendant within the Sentencing Guidelines on any relevant evidence that "has sufficient indicia of reliability to support its probable accuracy."  U.S.S.G. § 6A1.3; *see also* **United States v. Buchanan**, 70 F.3d 818, 828 (5th Cir. 1995), *cert. denied*, 116 S. Ct. 1340 (1996).  Further, once the government establishes that a firearm was present during the offense, the adjustment

should be applied "unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1(b)(1), comment. (n.3). In this case, there is no question that the firearms were connected with this offense. Firearms and cocaine were found in vehicles, in an apartment, and in a house, and all the evidence was connected to the defendants.

Oziel's contention that the firearms were not foreseeable also fails. We have held that a district court "`may ordinarily infer that a defendant should have foreseen a codefendant's possession of a dangerous weapon, such as a firearm, if the government demonstrates that another participant knowingly possessed a weapon while he and the defendant committed the offense.'" *United States v. Sparks*, 2 F.3d 574, 587 (5th Cir. 1993) (quoting *United States v. Aguilera-Zapata*, 901 F.2d 1209, 1215 (5th Cir. 1990)). It was readily foreseeable that firearms would be employed as tools of the drug trafficking trade. As such, we find no error, clear or otherwise, with the district court's application of § 2D1.1(b)(1).

Next, Oziel argues that the district court erred in denying his motion for a downward adjustment for his mitigating role in the offense under U.S.S.G. § 3B1.2. Oziel relies primarily on his responsibility for only 25 kilograms of the 1,555.5 kilograms of cocaine attributable to the conspiracy. He contends his amount of cocaine represents a mere two percent of the total. However, Oziel has not demonstrated that he was substantially less culpable than the other participants in this conspiracy, and, as a result, we find no clear error. *See* U.S.S.G. § 3B1.2(b); *United States v.*

16

*Brown*, 54 F.3d 234, 241 (5th Cir. 1995).

Finally, Garcia contends that the district court erred in sentencing him based on the quantity of cocaine memorialized in the drug ledgers seized from Inocencio's residence. Garcia maintains that he was only in Inocencio's house for two days and that the government failed to show that he ever bought, sold, traded, transported or delivered any of the cocaine found in the house. Further, the district court erred by failing to make specific fact findings concerning the quantity of cocaine attributable to each defendant.

Assuming Garcia properly preserved these issues for appeal, we find no clear error with the district court's decision to assign more than 150 kilograms to Garcia. See *Rodriguez*, 62 F.3d at 724. The evidence and testimony at trial clearly demonstrated that the cocaine and money found in Inocencio's house and in Tovar's apartment were the product and proceeds of this extensive drug trafficking operation. Evidence also showed that Garcia was present inside Inocencio's house and that he handled adding machine tapes and drug ledgers. Garcia's fingerprints were found on adding machine tapes, drug ledgers, and on a box containing currency. He had direct contact with Inocencio and Garza, he received two firearms from Inocencio, and cocaine residue was found on the adding machine tapes and ledgers.

"Under the Sentencing Guidelines, a defendant who participates in a drug conspiracy is accountable for the quantity of drugs[ ] which is attributable to the conspiracy and reasonably foreseeable

17

to him." ***United States v. Mitchell***, 31 F.3d 271, 277 (5th Cir. 1994); *see also* U.S.S.G. § 1B1.3(a)(1)(B).  The district court adopted the presentence report which specifically set out Garcia's involvement in this conspiracy.  Based on the evidence presented, the district court did not err in attributing more than 150 kilograms of cocaine to Garcia for sentencing purposes.

## CONCLUSION

For the foregoing reasons, we **REVERSE** the convictions of Garza and Garcia as to the money laundering count of the indictment and **REMAND** for appropriate resentencing.  We **AFFIRM** the remaining convictions and sentences for Inocencio, Oziel, Garza, and Garcia.