NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0595n.06

No. 09-6053

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

Aug 22, 2011

LEONARD GREEN, Clerk

UNITED STATES OF AMERICA,       )
                                )
        Plaintiff-Appellee,     )
                                )    ON APPEAL FROM THE UNITED
        v.                      )    STATES DISTRICT COURT FOR THE
                                )    EASTERN DISTRICT OF TENNESSEE
JOSE A. HERNANDEZ,              )
                                )
        Defendant-Appellant.    )

BEFORE:     KEITH, CLAY, and COOK, Circuit Judges.

**KEITH, Circuit Judge.** This case arises out of defendant Jose A. Hernandez's appeal of his conviction for possession with intent to distribute and aiding and abetting other defendants with their intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B) and 846. On appeal, Hernandez raises two issues. First, Hernandez argues that police officers illegally searched his home, and therefore, the district court should have suppressed all evidence found during that search. Second, Hernandez argues that the district court incorrectly approximated the quantity of cocaine that Hernandez conspired to distribute based on the cash found in his possession.

For the reasons discussed below, we **AFFIRM** the district court's judgment.

### FACTUAL BACKGROUND

On October 9, 2008, at approximately 5:30 a.m., Officer William Rhodes of the Washington County (Tennessee) Sheriff's Department stopped a black pickup truck that he observed weaving between lanes. The driver, Antonio Romero Chavez, failed a field sobriety test and was arrested for driving under the influence. Cecilia Heatherly, a co-defendant, was a passenger in the car.

A subsequent search of Chavez's car revealed $20,000. As a result of the find and its size, Rhodes contacted Agent Vince Walters, a Johnson City Police Officer working with the Drug Enforcement Agency. Walters subsequently departed towards the Ideal Storage facility, which Chavez had been driving towards at the time of his and Heatherly's stop.

Walters arrived at the storage facility around 10:45 a.m. and observed a black Chevrolet Suburban sport utility vehicle ("SUV") surrounded by a group of men, including defendant Jose Hernandez. After speaking with Hernandez, co-defendant Emigdio Rodriguez and co-defendant Elias Lopez, Walters conducted a consensual search of the black SUV. The vehicle search revealed one kilogram of cocaine and $69,190. As neither Hernandez nor Lopez spoke any English, Walters used Rodriguez as a translator to provide both defendants with *Miranda* warnings in Spanish before arresting them. Once the warnings had been provided, Walters transported Hernandez, Lopez and Rodriguez to the Washington County Detention Center. Heatherly was subsequently arrested on an outstanding warrant.

Upon Hernandez and Lopez's arrival at the detention center, a series of officers attempted to obtain their consent to search the trailer they co-habited in Washington County. As a means of obtaining such, officers requested the assistance of Deputy Amy Chizmar, who had received a bachelor's degree in Spanish from East Tennessee State University, and grew up speaking a Guatemalan dialect of Spanish. Hernandez refused to consent to the search, but Lopez proved more willing. Chizmar provided Lopez a "Consent to Search" form, which she independently had translated into Spanish. Before asking Lopez to sign the form, she reviewed the form with him orally, allegedly explaining to him in Spanish that he had the right to withhold consent and that the police expected to find additional drugs and money when they searched the residence. Lopez subsequently signed the form.

According to Hernandez, the language the form used was, at best, exceedingly formal, and, at worst, incorrect. Hernandez alleges that in many instances words were spelled incorrectly and formal words were used in place of the terms commonly used to communicate the intended ideas. The situation was further compounded, Hernandez argues, by the fact that Lopez, who received only one year of formal education, is illiterate – that is, he cannot read and has only limited verbal Spanish ability. At no point did Lopez or anyone else inform Chizmar of Lopez's limited language abilities.

Upon obtaining Lopez's signature, the officers searched Lopez and Hernandez's trailer. The search revealed $8,909 in cash hidden in a wall.

Based on the cash and drugs recovered from the trailer, the black SUV, and Chavez's black pickup truck, the officers concluded that defendants Chavez, Lopez, Rodriguez, Heatherly, and Hernandez together were responsible for distributing approximately two to four kilograms of cocaine per week over the course of a ten-month period. All five were subsequently indicted.

Before trial, Hernandez and Lopez moved to suppress the $8,909.00 found in the wall of their trailer. The dispute turned on whether Chizmar had used the proper Spanish term for search. Chizmar, in the form, used the term "registro" to explain that the police desired to search his trailer. Chizmar admitted upon cross-examination that "registro" normally is used to convey an intent to register, but defended her use of it on the form by noting that one of its accepted English translations is "to search." The defense presented testimony from Randall Wittig, a Spanish interpreter and translator, who criticized the language Chizmar had used in the form as exceedingly formal, to the point that it may have confused some Spanish speakers. In particular, Wittig noted that the word "cateo," which is commonly used to express an intent to search, was not included in the form. In response to Chizmar's testimony that "registro" technically meant search, Wittig admitted that while this may be the case in some Latin American countries, it is not used in Mexico, from which Lopez

3

hails. Wittig, however, noted that if the form had been explained verbally, it may have been easier to understand. No other testimony was provided.

The magistrate judge issued a report and recommendation ("R & R") recommending that the motion to suppress be denied because Lopez's consent was voluntary. The magistrate judge found that any problems with the consent form were immaterial in light of the fact that "Deputy Chizmar conversed with Mr. Lopez and she conversationally told him the purpose of the consent form and what she and the other officers were requesting." R. 86, R & R, at 8. The magistrate judge further noted that "even if the consent form had been worded as Mr. [Wittig] testified it should have been, it would have made absolutely no difference since Mr. Lopez was illiterate; he could not have read it in any event." *Id*.

Hernandez filed an objection to the magistrate judge's R & R with the district court. Before ruling, the district court heard additional testimony from Chizmar and Wittig. During her testimony, Chizmar reiterated that before she offered Lopez the form to sign, she verbally explained the form and the authorities' intent to search his residence. Chizmar then read the form into the record, translated into English as follows:

> Elias Lopez, having been informed of my constitutional rights to not authorize a search without a search warrant, having been informed of my right to deny the search, I declare that I authorize the search on behalf of Seargent Gregg, an officer of the Washington County Sherriff's Office, Johnson City, Tennessee, and whichever other officer of another agency that has been called to help conduct the search completed at my property located at 487 Washington College. These officers are authorized to take from my property papers, letters, materials, contraband or other property that they deem necessary. This permit, written permission is given to the officer stated above voluntarily and without threats or promises.

R. 178, Dist. Ct. Hr'g Tr. at 6-7. Chizmar stated that the form had been translated from English to Spanish "just the way it is written in English." *Id*.

4

Wittig testified and reiterated his view that the form contained a poor and inaccurate translation, the effect of which was compounded by Lopez's limited language abilities. When pressed by the district court as to how, given the context, "registro" could have meant anything but search, Witting conceded, "okay, it must be about a search." *Id*. at 15-16.

After hearing Chizmar's and Wittig's testimony, the district court adopted the magistrate's Report. The district court explained that:

> there is some caselaw out there that suggests that there may be language barriers that prevent a defendant from voluntarily agreeing to a search, voluntarily consenting; but I believe that in every case that I found there was testimony from the defendant himself that he did not in fact understand what he was told. I don't have any such testimony in this case . . . given the record, I think I have no alternative other than to overrule the objections and affirm the Magistrate Judge.

*Id*. at 21-22. On March 19, 2009, a jury convicted Hernandez and the case was moved to sentencing.

The United States Probation Office prepared a Presentence Investigation Report ("PSR"). The PSR concluded that Hernandez was responsible for having distributed 4.4 kilograms of cocaine To arrive at this drug quantity, the PSR converted the sum of $98,099, representing seized currency, into 3.4 kilograms by dividing the total cash amount by $29,000, the wholesale price of a kilogram of cocaine. This amount of 3.4 kilograms was then added to the one kilogram of cocaine found at the storage location where Hernandez, Lopez and Rodriguez were arrested, resulting in a total drug quantity of 4.4 kilograms, which yielded a base offense level of thirty. After applying a two-level enhancement for obstruction of justice, the PSR concluded that Hernandez's total offense level was thirty-two. Hernandez was placed in criminal history category I. A total offense level of thirty-two and criminal history category I yielded an advisory Guidelines range of 121 to 151 months of imprisonment.

Hernandez objected to the PSR, arguing, among other things, that it erroneously calculated the quantity of drugs for which Hernandez was responsible. First, Hernandez contested that

sufficient evidence existed linking him to the $20,000 found in Chavez's car. Second, Hernandez disagreed that the proper conversion rate should be based on the wholesale price of one kilogram of cocaine unmixed with any other substance; instead, he argued that the proper conversion rate should be the price at which Hernandez sold the cocaine mixed with other substances: $110,000 per kilogram. In support, he cited the testimony of William Gregg, a lieutenant in the Washington County Sheriff's Department, who testified, at the government's request, that while the wholesale cost of purchasing one kilogram of cocaine is $29,000, individuals selling drugs do not sell cocaine by the kilogram. Rather, he stated that narcotics distributors sell cocaine in smaller packages, ranging between one gram and one ounce. Gregg further testified that persons distributing drugs frequently mix cocaine with other masking agents that dilute the quality of cocaine, and therefore, pure cocaine, rarely, if ever, is found on the street. Gregg estimated that, on average, a gram of cocaine sells for approximately $1,000. Therefore, one kilogram of cocaine could be worth as much as $110,000.

The government presented testimony from Gregg that while cocaine is often sold in packages weighing less than a kilogram, smaller amounts are not always sold in gram quantities. Rather, Gregg testified, traffickers also sell drugs by the ounce. On such occasions, the price is much closer to the wholesale price of a kilogram:

> Generally if we buy an ounce, they'll give you a cut rate price; so if you're buying grams from them, they're going to hit you at $100 a time; but if you're going to call and say, I need an ounce, they're going to cut you a deal. An ounce is 28 grams, and we generally get it for a thousand dollars.

R. 174, Dist. Ct. Hr'g Tr. at 63. The government elicited further testimony demonstrating that the conspiracy in which Hernandez was involved distributed cocaine by the ounce at prices which roughly accorded with the price to which Gregg testified. For example, Heatherly testified that Romero would often break up one kilogram of cocaine into smaller pieces of approximately ten

6

ounces in size "depend[ing] on what they wanted." *Id*. at 34. In return, she would receive anywhere between $7,000 and $10,000 depending on the amount of cocaine she delivered. Heatherly further testified that Hernandez, on Romero's orders, would often deliver cocaine packages of similar sizes. Rodriguez, who purchased cocaine from Hernandez, also testified as to the size of Hernandez's sales. Rodriguez recounted that he purchased cocaine from Hernandez for approximately three months, and would purchase "two to four ounces of cocaine at a time" and pay anywhere between $800 and $920 per ounce. *Id.* at 73.

In considering the appropriate drug quantity, the district court began by eliminating the $20,000 found in Chavez's and Heatherly's vehicle from the conversion calculation, reasoning that no testimony at trial directly linked the cash to Hernandez. Accordingly, the total cash amount remaining to be converted into drug quantity was $78,099, as opposed to the $98,099 figure the PSR initially proposed.

The district court then rejected Hernandez's argument that the PSR used an improper price of cocaine when calculating the amount of the drugs Hernandez had handled. The court began by noting that "[i]t seems reasonably clear from the proof at trial . . . that the seventy-eight thousand [dollars] . . . represented the proceeds of drug sales." R. 168, Sentencing Hr'g Tr., Sept. 30, 2009, at 9. The court then explained that although "there is some language in these Sixth Circuit cases about the quantity of cocaine used being the amount represented as having been sold rather than the amount which could have been purchased [with the cash found]," the latter provided the appropriate method of conversion. *Id*. at 10. The court explained:

> As I said, the Sixth Circuit has repeatedly approved a conversion where the Court determines the price generally obtained for the controlled substance and converts that amount of cash to the amount that could be obtained. And absent any case law that suggests another way of calculating it, that's what the Court's going to apply.

*Id*.

7

Accordingly, the court converted the cash, $78,099, to 2.7 kilograms of cocaine by dividing the cash by $29,000 and added that to the actual kilogram of cocaine found, for an aggregate drug quantity of 3.7 kilograms. Applying its finding to the Sentencing Guidelines, the district court concluded that Hernandez's recommended sentence was between 121 and 151 months of imprisonment. The district court concluded that a below the Guidelines sentence of ninety-six months was appropriate.

Hernandez timely appealed the denial of his motion to suppress and his sentence.

## DISCUSSION

As noted above, Hernandez raises two issues on appeal. First, he argues that Lopez did not knowingly and voluntarily consent to the police search of their home. Second, Hernandez argues that the district court incorrectly calculated the amount of cocaine attributable to him because the court relied on the wholesale price of one kilogram of cocaine, as opposed to the price at which Hernandez sold the cocaine. Accordingly, he argues that his sentence, the length of which was dependent on the amount of drugs he distributed, was incorrect.

### I. The District Court Properly Denied Hernandez's Motion to Suppress.

#### A. Standard of Review

When reviewing a district court's denial of a motion to suppress evidence, the district court's factual findings are examined for clear error, while its conclusions of law are reviewed de novo. *United States v. Jenkins*, 124 F.3d 768, 771-72 (6th Cir. 1997). The evidence is reviewed in the light most favorable to the district court's conclusions. *Id.* at 772. "A factual finding is clearly erroneous when, although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Blair*, 524 F.3d 740, 747 (6th Cir. 2008) (internal quotation marks and citation omitted).

### B.        Analysis

It is well established that the Fourth Amendment prohibits government intrusion into one's home without obtaining a search warrant, receiving voluntary consent or the existence of exigent circumstances. *Griffin v. Wis.*, 483 U.S. 868, 883 (1987). The determination of "whether consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all of the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). Several factors should be examined when determining whether consent is valid, including the age, intelligence, and education of the individual who purported to give consent; whether that individual understood the right to refuse consent; whether that individual understood his or her constitutional rights; the length and nature of detention; and the use of coercive or abusive conduct by the police. *United States v. Jones*, 846 F.2d 358, 360 (6th Cir. 1988) (citing *Schneckloth*, 412 U.S. at 226, 248).

"Consent must be proved by clear and positive testimony and must be unequivocal, specific, and intelligently given, uncontaminated by any duress and coercion." *United States v. Williams*, 754 F.2d 672, 674-75 (6th Cir. 1985). Moreover, in a warrantless search, the government bears the burden of proving consent. *Jones*, 846 F.2d at 360. "This burden is of course heavier where it appears that the owner is illiterate or a foreigner who does not readily speak and understand the English language." *Kovach v. United States*, 53 F.2d 639 (6th Cir. 1931) (per curiam); *see also United States v. Hernandez*, 913 F.2d 1506, 1510 (10th Cir. 1990) (explaining that "language barriers may inhibit a suspect's ability to [act] knowingly and intelligently").

Although we have yet to consider a situation analogous to the one at issue in this case, a number of other circuits have considered similar circumstances, and refused to reverse the district court's denial of a motion to suppress. *See, e.g., United States v. Rojas-Millan*, 234 F.3d 464, 470 (9th Cir. 2000) ("[Defendant] objects to the use of the verb 'registren,' which, according to the

testimony of a court translator, could mean either 'to search' or 'to register.' This argument collapses, however, because the translator further testified that, in the context of the form, 'registren' meant 'to search.'" (internal citations omitted)); *United States v. Perez-Llanes*, No. 04-2224, 2005 U.S. App. LEXIS 9375, at *2 (8th Cir. May 16, 2005) (finding that consent was valid even though "the officer asked Perez if the officers could search the car, using the Spanish word 'registrar' rather than 'esculcar.'"); *United States v. Garza*, 118 F.3d 278, 282-83 (5th Cir. 1997) (refusing to reverse a district court's finding that defendant voluntarily consented where the police misspelled the Spanish word for "premises," therefore resulting in the use of a term meaning "logical proposition" and defendant testified that he did not understand police were going to search his home). While these cases decided by other circuits are merely persuasive, the circumstances of this case do not support a conclusion that the district court's finding was clearly erroneous.

Hernandez's argument rests primarily upon Chizmar's allegedly incorrect use of the Spanish word for search. But even if the word was incorrect, Hernandez admits that Lopez was illiterate, meaning that he could not have read the form, regardless of what word it used. What the form said, much less whether one word was correctly or incorrectly used in it, cannot be dispositive as to Lopez's consent. *See Garza*, 118 F.3d at 282 ("The fact that the consent form was incorrectly translated is irrelevant given that Inocencio never read the form and could not have mistakenly relied on its translation."); *see also United States v. Acosta-Tapia*, 69 F. App'x 885, 887 (9th Cir. 2003) ("We note, however, that the officers could have eliminated any question about the consent in this case by reading the Spanish translation of the consent form aloud to Ortiz, who was largely illiterate but could understand spoken Spanish.").

Rather, whether Lopez voluntarily consented is largely dependant upon the sufficiency of the oral explanation that Chizmar provided to Lopez. Chizmar testified that she not only orally asked for Lopez's consent, but also explained to him verbally what the police were looking for and that

Lopez had the right to withhold consent. Hernandez presents no specific evidence: a) disputing Chizmar's allegations as to what she told Lopez; b) suggesting that her description and request was insufficient or misleading; or c) supporting the notion that Lopez did not understand what Chizmar said to him. Rather, he relies solely on the fact that Chizmar grew up speaking a Guatemalan dialect of Spanish and that Lopez is from Mexico. On this basis, he speculates that just as Chizmar used the incorrect term for search, she likely used incorrect terms for a number of other words in her oral explanation. Undoubtedly, the quality and appropriateness of a translation is an important consideration for a reviewing court in determining whether consent was voluntary in a case such as this; nevertheless, speculation as to the use of an incorrect dialect, and what might have been said, does not demonstrate clear error.

Even assuming that Chizmar, in her oral conversations with Lopez, used the Spanish word "registro" to convey an intent to search, we cannot conclude that this error alone was so great as to render the district court's finding clearly erroneous. While one may speculate that Lopez had questions as to the meaning of the term itself, given Chizmar's testimony that as she provided Lopez with an oral explanation in Spanish that he had the right to withhold consent and that the police expected to find additional drugs and money when they searched the home, the district court reasonably found that Lopez's consent was valid. *See United States v. Marin*, 761 F.2d 426, 434 (7th Cir. 1985) ("The consent form, as translated by the interpreter at the suppression hearing, did not translate perfectly into English. Although certain nuances of the original may be lost, it is possible to translate between Spanish and English; we agree . . . that the Spanish translation adequately communicated the concepts . . . ."). Finally, this conclusion is further supported by Hernandez's own expert who admitted during his cross-examination that given the context of what was being said, it is not clear what Lopez could have understood the conversation to be about other than a police search.

11

Admittedly, there are troubling aspects of this case, but without any evidence supporting Hernandez's argument that what Chizmar said during her oral explanation was inaccurate or improper – for example, testimony from Lopez – we cannot conclude that the district court committed clear error. *See United States v. Gutierrez*, 221 F. App'x 446, 450 (7th Cir. 2007) ("[Defendant] calls the form 'defective' and seems to suggest that he did not understand the consent form because it was poorly translated. Yet he offers no reason why the district court was wrong to conclude that given the context of the encounter, he must have understood that the agents were asking for permission to search.").

Accordingly, the district court's denial of Hernandez's motion to suppress is affirmed.

## II. The District Court's Calculation of the Amount of Drugs Hernandez Distributed Was Not Clearly Erroneous.

### A. Standard of Review

We review a sentencing court's determination of drug quantity for clear error. *United States v. Bartholomew*, 310 F.3d 912, 923 (6th Cir. 2002). The quantity of drugs must be supported by a preponderance of the evidence. *United States v. Hough*, 276 F.3d 884, 891 (6th Cir. 2002). "A finding [of fact] is clearly erroneous when, although there may be some evidence to support [the finding], the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

### B. Analysis

For sentencing purposes, Hernandez's base offense level for the crime of possession with intent to distribute cocaine is determined pursuant to § 2D1.1 of the United States Sentencing Guidelines ("U.S.S.G."). The commentary to § 2D1.1 states that

> [t]ypes and quantities of drugs not specified in the count of conviction may be considered in determining the offense level. *See* § 1B1.3(a)(2) (Relevant Conduct).

12

> Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the sentencing judge shall approximate the quantity of the controlled substance. In making this determination, the judge may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved.

U.S.S.G. § 2D1.1 cmt. n.12.

Relying on comment 12, this Court has previously approved the conversion of seized funds into an equivalent amount of drugs, *United States v. Keszthelyi*, 308 F.3d 557, 577 (6th Cir. 2002) (collecting cases), as long as the government "prove[s] by a preponderance of the evidence both the amount of money attributable to drug activity and the conversion ratio – i.e., the price per unit of drugs," *id.* (citing *United States v. Jackson*, 990 F.2d 251, 253 (6th Cir. 1993)); *see also United States v. Sandridge*, 385 F.3d 1032, 1037 (6th Cir. 2004), and the district court errs on the side of caution in making this estimate. *See Keszthelyi*, 308 F.3d at 577.

As noted, Hernandez argues that the district court incorrectly used the wholesale purchase price of one kilogram of cocaine, $29,000, as opposed to the actual price at which cocaine is sold on the street. In support, Hernandez relies exclusively on the testimony of Lieutenant Gregg that street vendors often sell cocaine in small quantities after mixing in various other agents. Ultimately, one kilogram of cocaine, when mixed with other agents, Gregg testified, could be worth as much as $110,000.

Hernandez, in arguing that the $110,000 per kilogram rate should have been used at his sentencing, overlooks two salient points. First, while Gregg testified that a gram could sell for as much for $110,000, he also pointed out that cocaine is often sold by the ounce. In such circumstances, the cocaine trafficker often provides the buyer a discounted rate of $1,000 per ounce or approximately, $35,300 per kilogram – a rate roughly similar to the one used by the district court. Second, Hernandez overlooks that all available evidence in this case suggests that he sold cocaine,

13

not by the gram, but rather by the ounce. Accordingly, if we were to accept Gregg's testimony as to the price of cocaine when sold by street vendors, it would be inapplicable to Hernandez's situation. As noted, Heatherly, Hernandez's co-defendant, testified that Romero, the leader of the scheme, would purchase cocaine by the kilogram and then break off ounce quantities for Heatherly and Hernandez to distribute. Heatherly testified that she would usually transport packages containing at least ten ounces of cocaine and, in return, would receive payments of approximately $7,000-$10,000, or $24,700-$35,300 per kilogram. She testified that Hernandez would likewise deliver packages containing similar quantities of cocaine. While she was unaware of the amount of cash that Hernandez would receive in return, Rodriguez testified that he bought anywhere between two and four ounces from Hernandez and, in return, paid between $800 and $920 per ounce, or anywhere between $28,200 and $32,400 per kilogram.

Had Hernandez presented compelling evidence that he did in fact distribute cocaine by the gram and then sold it at the price Gregg's testimony indicated, a different resolution may have been appropriate. However, all available evidence indicates that Hernandez distributed cocaine by the ounce and did so for a price roughly equivalent to that used by the district court for the purposes of its approximation calculation. Given the substantial evidence supporting the district court's decision, we cannot say its approximation was clearly erroneous. *See Sandridge*, 385 F.3d at 1038 (reversing district court's calculation where "no evidence was presented to show that the cash was related to the sale of cocaine base, as opposed to marijuana, the other drug found in Sandridge's car"); *United States v. Samour*, 9 F.3d 531, 538 (6th Cir. 1993) (finding lower court's calculation clearly erroneous where "there was no testimony in the record regarding the $300 or $320 amounts, and the record [did] not indicate how the district court reached these figures"), *overruled on other grounds by United States v. Reed*, 77 F.3d 139 (6th Cir. 1996).

14

## CONCLUSION

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.