# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

### No. 97-10814

### UNITED STATES OF AMERICA,

**Plaintiff-Appellee,**

### VERSUS

### JOANN WINTER; DENNIS WAYNE LANG; WILLIAM MARK LAWRENCE; CHARLES EMERY WITHEE; and JOSEPH WALLACE RIDGEWAY, also known as Joey Ridgeway,

**Defendants-Appellants.**

Appeal from the United States District Court
for the Northern District of Texas
(3:96-CR-326-5-P)

June 25, 1999

Before CHIEF JUDGE KING, REYNALDO G. GARZA, and JOLLY, Circuit Judges.

PER CURIAM:[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

On September 25, 1996, twelve defendants were indicted in the Northern District of Texas pursuant to a two-count indictment. All five Appellants in this case, Joann Winter ("Winter"), Dennis Wayne Lang ("Lang"), William Mark Lawrence ("Mark Lawrence"), Charles Emery Withee ("Withee") and Joseph Wallace Ridgeway ("Ridgeway") (collectively referred to as "Appellants") were charged with conspiring to distribute methamphetamine in violation of 21 U.S.C. § 866 ("Count I"). Winter was also charged with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) ("Count II"). All five Appellants pled not guilty. A trial by jury

---

[1] Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1

was conducted and all of the Appellants were convicted on Count I. Winters was also convicted on Count II.

The government unraveled the drug trafficking conspiracy, which centered around Alberto Campos ("Campos"), by introducing into evidence testimony from cooperating conspirators[2] and law enforcement agents,[3] evidence seized during the execution of search warrants, taped conversations and business records. The testimony of the government's primary witnesses will now be discussed in detail.

Francis Colacion's testimony

Ms. Francis Colacion ("Colacion"), Campos' secretary/receptionist, worked with Campos and Carr at Selland Auto Transport ("Selland") in the early 1990's. Colacion noticed that Campos, who had been struggling financially before he opened AMC Trailer, had a sudden change in lifestyle soon after opening AMC Trailer. Campos began acquiring many new cars and making a lot of money.

As part of her employment with Campos, Colacion moved to Fontana, California. In California, she met many of the people who were later charged in the drug conspiracy. She met Franks, Carr, Rains, Ridgeway, Winter and Ian Beezer. Colacion explained that Carr, who lived in Texas, would travel to California three or four times a month to see Campos and that Ridgeway was Campos' driver in California for several months. She also testified to meeting Winter at least twice, once in Texas and once in California. She stated that she often saw Ian Beezer, but that

---

[2]The government utilized the testimony of Campos, Steven Carr ("Carr"), Rosie Summers ("Summers"), Charles Michael Lawrence ("Charles Lawrence"), John Skogen ("Skogen"), Rita Rains ("Rains"), Wayne Franks ("Franks"), Ian Beezer ("Ian Beezer"), Angela Beezer ("Angela Beezer") and Dorothy Brusaw ("Brusaw") against the five Appellants.

[3]Francisco Velasco ("Velesco"), an Immigration and Naturalization Service ("INS") Officer, Steven Woodson ("Woodson"), a Drug Enforcement Agency ("DEA") agent, Vance Flowers ("Flowers") and Steve Lupo ("Lupo"), canine officers with the Irving Police Department, Aaron Butler ("Butler"), an officer with the Florida Department of Transportation, Anthony Vaughn ("Vaughn"), DEA agent and Paul Shanks ("Shanks"), IRS Criminal Investigation Division agent, were some of the law enforcement agents that testified for the government.

she was not sure what his job entailed.

After the shop was set up in the city of Fontana, Colacion testified that Summers moved to California to take over that office's management duties. Colacion explained that Summers lived in the same apartment complex as Ian Beezer and that numerous Federal Express packages were received at the Fontana Shop. Most of the packages came from Dallas, which Colacion assumed were sent by Carr. Summers or Campos would usually take care of the packages. Summers would customarily sign for the packages, close the office door and open the packages in her office. Usually if a package arrived while Summers and Campos were in Texas, they would call and have Colacion sign for it and put it in the office. On one occasion Campos and Summers were in Texas when a Federal Express package arrived. Campos called Colacion and asked her to open the package. Colacion testified that there were $10,000 in the box. The money was in one hundred dollar bills and bundled up in newspaper. Colacion, at Campos' direction, took the money, paid the workers and then deposited the remainder. Colacion also explained that he picked up a number of Western Union wire transfers for Campos.

Steven Carr's testimony

Carr was involved in the methamphetamine distribution conspiracy and had a working relationship with many of the people charged in the indictment, including: Winter, Mark Lawrence, Ridgeway and others. Carr, a truck driver by trade, testified that he met Campos in California. Carr began buying methamphetamine from Rains in 1986 and approached Campos about going into the methamphetamine business in 1989. Carr explained to Campos that he had buyers in Texas and asked Campos if he was interested in supplying them with the methamphetamine. Campos agreed.

As arranged by them, either Carr and/or Franks would drive to California, pick up the drugs from Campos and then drive the drugs back to Texas. After the drugs were sold, the money was sent back to California to pay Campos and his suppliers. Franks and Carr were bringing back 5-10 pounds of drugs every time they traveled from California to Texas. The drugs

3

were then divided between Carr and Rains for sales in Texas and the East Coast.

In 1992, Carr opened up CL&C[4] with Campos and Charles Lawrence. Charles Lawrence had been one of Carr's biggest methamphetamine customers. Winter and Charles Lawrence worked at CL&C; neither Rains nor Franks worked there.

Franks was regularly paid to go to California and pick up the drugs that Campos fronted to Carr and the other co-conspirators. Winter and the other co-conspirators would then send Campos his money via Federal Express. Carr testified that sometimes Franks or Summers would carry the money back to California. Carr explained that he would rarely use Western Union to send the money because it was too expensive.

In October of 1992, Carr and Charles Lawrence needed to deliver $50,000 to California to buy drugs from Campos. Mark Lawrence volunteered to drive the money to California. Carr gave Mark Lawrence a map and directions. Mark Lawrence was stopped at a border checkpoint in Las Cruces, New Mexico on his way to California. The money was then seized by agents of the Drug Enforcement Agency ("DEA").

In 1993, Brusaw began collecting drug monies for Campos. She kept a ledger of the monies owned and collected. Carr continued sending money via Federal Express and sometimes delivered it personally. By 1994, Campos had moved to Texas. Carr had received a bad load of drugs from Campos and began buying drugs from Ian Beezer. Carr stated that Ian Beezer and Campos were working together.

Carr identified Winter, Mark Lawrence, Lang and Ridgeway in the courtroom. Carr explained that Ridgeway had been a customer of his. Carr had sold him 1-2 pounds of methamphetamine in late 1994-1995. Carr fronted Ridgeway some drugs and Ridgeway paid for most of it. As for Lang, Carr explained that Lang worked for Campos, Franks and Carr at various times.

___

[4]CL&C was a welding shop that manufactured and reconditioned car haulers. The company lasted only seven months.

<u>Officer Francisco Velasco's and Agent Steven Woodson's testimony</u>

Velasco, an INS officer, was working at the border checkpoint in Las Cruces, New Mexico the night Mark Lawrence was stopped. Mark Lawrence was unable to answer basic questions about his citizenship, had no identification, was confused as to the purpose of his trip, and his vehicle's papers and registration seemed suspicious. A canine dog alerted on the vehicle and Velasco asked to search the vehicle. Mark Lawrence stated that he had $50,000 cash which was then seized.

DEA agents were contacted and Mark Lawrence spoke with Woodson, a DEA agent. Mark Lawrence told Woodson that the money belonged to Carr and his brother Charles Lawrence. Mark Lawrence said that he was going to Ontario, California to buy auto parts. Mark Lawrence had a map and other papers in the vehicle which outlined his route from Dallas and back. He also had California telephone numbers and addresses and a notation regarding a call in Albuquerque. When questioned about these items, Mark Lawrence stated that he was going to California to buy a car and to Albuquerque to buy car parts. He told Woodson that the $50,000 came from the sale of trailers by Carr and Charles Lawrence. Mark Lawrence explained that the extra cash that he was carrying was from his paycheck received from CL&C. He also stated that he was going to get reimbursed for his travel expenses, but he had thrown away all of his receipts. When questioned about some of the names and numbers in his wallet, Mark Lawrence stated that "Steve" was not actually Steve Carr and that Winter did not work for CL&C. Mark Lawrence also stated that the secretary was Joann Woodward and not Winter, and that he did not know Franks, the owner of the truck. Mark Lawrence told Woodson that he was currently on probation for possession of methamphetamine. Woodson telephoned Carr and Charles Lawrence. Both denied that the money came from the sale of a trailer or that they paid their employees by checks. They also acknowledged that Winter was their secretary.

<u>Wilbert James' testimony</u>Wilbert James ("James") was convicted in state court for drug dealing. He was a truck driver who purchased methamphetamine from Charles Lawrence in the late

1980's. James, in turn, dealt to other truck drivers. During the late 1980's, James had numerous conversations with Charles Lawrence and Mark Lawrence about their methamphetamine dealings.

James explained that Charles Lawrence set up the "Social Club," whose members included: Charles Lawrence, Mark Lawrence, Steve Harwell ("Harwell") and James. Each one of them would pay Charles Lawrence a set fee. Charles Lawrence would then supply each one of them with methamphetamine to sell. The four of them ran the Social Club. Mark Lawrence worked for Charles Lawrence; he did anything necessary to further the drug business. Winter worked for Charles Lawrence selling the Club's drugs. Charles Lawrence told James that he was having problems with Winter and that Mark Lawrence had "messed up" because of what transpired with Agent Woodward. The Social Club continued until 1993.

James stated that Campos supplied drugs to Charles Lawrence, and James was present at CL&C to receive a share of a drug load. Winter was also there in June of 1992, when the drugs were delivered. Charles Lawrence opened the package and he and James snorted some of the methamphetamine in front of Winter. James also explained that Franks was the driver who brought the loads from California.

### Dorothy Brusaw's testimony

Brusaw stated that she met Carr, Rains and Franks while working for Grady Gibson from 1989-1992. Brusaw bought drugs from Rains and knew that Carr, Rains and Franks were in the drug business together. Brusaw testified that she was present when the drugs were delivered from California.

Brusaw testified that in the spring of 1992, Rains asked Brusaw to mail a bulging letter-sized Federal Express package from Carr to Campos in California. Rains assured Brusaw that she was not shipping drugs, so Brusaw agreed to ship it. A week later Brusaw was asked to ship another package. Angela Beezer, who had been present while they counted the money, told Brusaw that it contained $40,000.

Brusaw stated that she had met Summers in 1991 and Campos on June 26, 1992. In

6

January of 1993, Brusaw moved in with Rains for the second time. During that period, Brusaw learned about the transportation of drug money to California. Brusaw described how Summers personally delivered and used Federal Express to send money to Campos. Brusaw also testified that Winter told her that she personally delivered $50,000 to California.

Brusaw explained that in September of 1993, she began collecting monies for Campos in Texas. She collected from four people: Carr, Charles Lawrence, Rains and Franks. Summers kept records of the debts owed. When collecting from Winter, Brusaw would usually go to her house and Winter would give her the money in Federal Express packages. Brusaw would then use fake names to send the money to California. Brusaw declared that in November of 1993, Winter brought money to Brusaw's house. Campos and Angela Beezer were also present. Winter gave $7,000 to Campos and received five pounds of Methamphetamine. Brusaw stated that she kept a ledger of the monies owed and of what she collected. She made copies of the ledger when she quit working for Campos in December of 1993.

Angela Beezer's testimony

Angela Beezer testified that Rains, Carr, Franks, Summers and Campos were heavily engaged in drug trafficking. She explained that in May of 1992 she began to assist in packaging money for Carr to ship to California. She saw Campos deliver drugs to Rain's house by Campos, and saw Summers taping money to her body so that she could carry it back to California.

Angela Beezer stated that she met Ian Beezer in 1994. By March they were involved in a relationship. In April of 1994, she began dealing drugs with Ian Beezer. Ian Beezer got his drugs from California and would often bring the drugs to Texas personally. The money used to pay for the drugs, however, was still mailed via Federal Express to California or delivered personally by someone.

Angela Beezer described how she assisted Ian Beezer with his business, but only had one customer of her own, Withee. When first approached by a friend to sell to Withee, Angela Beezer told him she could only deal in one pound lots. Withee would buy several ounces, almost on a

7

daily basis. Angela Beezer sold drugs to Withee from approximately May of 1994 through September of 1994. Angela Beezer sold a total of approximately eight pounds of methamphetamine to Withee.

Angela Beezer also testified that in January of 1995, she sold Withee two additional pounds of methamphetamine. On February 21, 1995, Angela Beezer went to Withee's house to collect the remainder of the money owed for the methamphetamine. She collected $800 and gave it to Ian Beezer. That night, Ian Beezer was arrested, and DEA agents searched his home. During the search, the DEA agents seized guns, drugs, money and numerous records of the drug distribution ring. Notes of drug activities confirmed the relationship with Withee, Lang, Ridgeway, Summers and others. The notes also corroborated the money transfers to California. Angela Beezer stated that as soon as the agents left, she telephoned Withee, said "DEA" to Withee, and Withee responded "O.K." Angela Beezer then hung up. Summers and Ridgeway came over to her house after the agents left.

### Ian Beezer's testimony

Ian Beezer testified that he had known Campos since 1989 and was aware of Campos' and Carr's drug deals since 1991. Ian Beezer's involvement in the drug dealings began in 1992. Also in that year, Ian Beezer met Campos' suppliers, Tello and Rafa. Ian Beezer assisted in the transport of both drugs and money from California to Texas and back. In 1994, Campos moved his operation to Texas. Ian Beezer also moved and established his own clientele. It was then he became involved with Angela Beezer.

Ian Beezer explained that Campos was experiencing difficulty getting drugs from suppliers due to a bad load that he had received. Therefore, Ian Beezer utilized this opportunity to begin taking over Campos' distribution network. Ian Beezer continued uninterrupted until his arrest. Ian Beezer dealt drugs with Carr, Charles Lawrence, Franks and Winter. The drugs were still fronted by Rafa and Tello. Ian Beezer would mail or carry the money back to California to pay

8

for the loads. Ian Beezer testified to the same transaction described by Brusaw, where Winter purchased drugs in Brusaw's home. Ian Beezer further explained that he had a copy of Brusaw's ledger, which he gave to Rafa and Tello.

Ian Beezer stated that Ridgeway and Lang were his customers. In January of 1995, Ian Beezer sold Ridgeway one pound of drugs for cash money up front. The drug notes seized from his home in February 1995 confirmed that Ridgeway was a customer. Lang worked for Carr and Campos, and performed errands to assist Ian Beezer in his dealing, including purchasing airplane tickets. In December of 1994, Lang approached Ian Beezer and asked him to front Lang some drugs to sell because he was in a jam. Ian Beezer confirmed that he fronted one pound of drugs and got most of his money back before his arrest by DEA agents at his home. Finally, Lang went with Ian Beezer to the airport to pay the suppliers. Each of them carried a portion of the $10,000 into the airport to give to Rafa.

Officers Vance Flowers' and Steve Lupo's testimonies

Flowers, a canine officer with the Irving Police Department, testified that he was called on March 30, 1996 to the Doubletree Hotel by the head of security. Hotel security informed Flowers that Ridgeway, who had checked into the hotel with a local address and no identification, was placing numerous local phone calls. Flowers and his partner, Lupo, explained that they went to Ridgeway's room and asked him if they could come in. Ridgeway was asked by the officers for his identification and he produced an expired Arkansas drivers licence. Ridgeway gave the officers permission to look around the room. The officers saw a package on the bed and Ridgeway denied it belonged to him. The officers opened the package and discovered methamphetamine. Ridgeway was arrested and his bags were searched. The search yielded tupperware containing a cutting agent, two scales,[5] $3,500 in cash, and baggies. Ridgeway

---

[5] One of the scales seized had Ridgeway's name engraved on it.

claimed to have just purchased these items from a friend.[6]

### Officer Aaron Butler's testimony

Butler, an officer with the Florida Department of Transportation, testified that he stopped Lang on May 24, 1995 at a routine traffic checkpoint while checking truckers. Butler explained that Lang, who was driving an eighteen wheeler, was dazed, looked worn out and was unable to answer simple questions about where he had come from and where he was going. Lang and his passenger gave inconsistent answers to these questions. Lang was also behind on his logbook entries and had been cited two days previously for the same violation. After obtaining Lang's consent, the truck was searched and the drugs were discovered. Lang was charged and pled guilty to the drug offense.

### Agents Anthony Vaughan's and Paul Shanks' testimonies

Vaughn, a DEA agent, and Shanks, an IRS agent, showed the links between the Appellants and the co-conspiracy by introducing into evidence telephone records, wire transfer records and tax records.

### Sentencing

After the jury rendered a guilty verdict against all five of Appellants under Count I and against Winter under Count II, the Appellants were sentenced by the district court as follows:

| Appellant | Term of imprisonment | Term of supervised release |
|---|---|---|
| Winter | 276 (Count I) 240 months (Count II) | Five years / $2,500 fine |
| Lang | 120 months | Five years / $2,500 fine[7] |
| Mark Lawrence | 160 months | Five years / $2,500 fine |
| Withee | 121 months | Five years / $2,500 fine |
| Ridgeway | 121 months | Five years / no fine |

This appeal followed.

---

[6]Ridgeway's arrest at the Doubletree Hotel by the Irving Police Department will be referred hereafter as "the Irving drug transaction."

[7]The district court ordered that payment of Lang's $2,500 fine was to begin while the defendant was incarcerated, the balance payable through monthly installments of at least $50.00 beginning 60 days after his release from custody. The district court further ordered that the interest on the fine be waived.

10

II. DISCUSSION

A. *Sufficiency of the evidence*

Standard of review

When the sufficiency of the evidence is challenged on appeal, this Court reviews the evidence and all the reasonable inferences which flow therefrom in the light most favorable to the verdict. *United States v. Scott*, 159 F.3d 916, 920 (5th Cir. 1998). The conviction must be affirmed if any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Crow*, 164 F.3d 229, 237 (5th Cir. 1999). This Circuit has noted that in applying the sufficiency of the evidence standard, we must view the evidence in light most favorable to the government. *Id.* at 237. In addition, "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. 1982) (en banc), *aff'd on other grounds,* 462 U.S. 356 (1983). This Court is not charged with weighing the evidence or gauging the credibility of the witnesses. *United States v. Millsaps*, 157 F.3d 989, 994 (5th Cir. 1998). The standard of review is the same whether the evidence is direct or circumstantial. *Scott*, 159 F.3d at 920.

Analysis

1. *Count I, the drug conspiracy*

The Appellants argue that there is insufficient evidence to connect them to the drug conspiracy. To establish a conspiracy under 21 U.S.C. § 846 the government must prove beyond a reasonable doubt: (1) that an agreement existed between two or more persons to violate a federal drug statute; (2) that each alleged conspirator knew of the conspiracy; (3) that each alleged conspirator intended to join the conspiracy; and (4) that each alleged conspirator participated voluntarily in the conspiracy. *United States v. Medina*, 161 F.3d 867, 872 (5th Cir. 1998), *cert. denied,* 119 S.Ct. 1344 (1999).

The government must prove more than mere knowledge of a conspiracy or association

11

with conspirators. *United States v. Torres*, 114 F.3d 520, 525 (5th Cir.), *cert. denied*, 118 S.Ct. 316 (1997). Knowledge and association, however, may be combined with other circumstantial evidence to prove an agreement to join a conspiracy. *United States v. Payne*, 99 F.3d 1273, 1278 (5th Cir. 1996). The government is not required to prove all of the details in a conspiracy or the detailed participation of all its members. *United States v. Saenz*, 747 F.2d 930, 938 (5th Cir. 1984), *cert. denied*, 473 U.S. 906 (1985) (citing *United States v. Alvarez*, 625 F.2d 1196, 1198 (5th Cir. 1980) (en banc), *cert. denied*, 451 U.S. 938 (1981)). The government must only establish that the defendants had knowledge of the conspiracy. *Saenz*, 747 F.2d at 938.

"'The jury may infer any element of this offense from circumstantial evidence.'" *United States v. Paul*, 142 F.3d 836, 839 (5th Cir.), *cert. denied*, 119 S.Ct. 271 (1991) (quoting *United States v. Lechuga*, 888 F.2d 1472, 1476 (5th Cir. 1989)). Accordingly, "'[a]n agreement may be inferred from concert of action, [v]oluntary participation may be inferred from a collocation of circumstances, and [k]nowledge may be inferred from surrounding circumstances.'" *Paul*, 142 F.3d at 839 (quoting *Lechuga*, 888 F.2d at 1476).

The government contends that the first element, the existence of an agreement between two or more persons to violate a federal statute, has been clearly established. In addition, the evidence showed that Lang, Mark Lawrence, Withee and Ridgeway had knowledge of, intended to join, and actually participated in the conspiracy. Moreover, the government notes that it did not rely solely on one co-conspirator's testimony. Rather, six co-conspirators testified and each corroborated what the other witnesses stated. Moreover, the government further corroborated the witnesses' testimonies by a number of other sources including: drug notes, ledgers, telephone records, hotel receipts, Federal Express airbills, Western Union transfers, recorded conversations and surveillance tapes.

The Appellants' contend that the evidence presented at trial was insufficient to support their conviction because the evidence revealed that there was more than one conspiracy. The Appellants also maintain that there is insufficient evidence to demonstrate that they knew of the

12

conspiracy, intended to join the conspiracy, or voluntarily participated in the drug conspiracy.

After reviewing the record, we find that the evidence presented at trial sufficiently demonstrated the elements of a single drug conspiracy in which all of the Appellants were conspirators. Therefore, a rational trier of fact could have found each of the Appellants guilty beyond a reasonable doubt of the essential elements of this offense.

2. *Count II, the money laundering conspiracy*

To establish the offense of money laundering, the government must prove beyond a reasonable doubt that Winter: (1) knowingly conducted a financial transaction; (2) that the financial transaction involved the proceeds of an unlawful activity; and (3) she intended to promote or further that unlawful activity. *United States v. Garza*, 118 F.3d 278, 284 (5th Cir. 1997) (citing *United States v. Thomas*, 12 F.3d 1350, 1360 (5th Cir. 1994)). A financial transaction is a transaction which in any way or degree affects interstate or foreign commerce and involves the movement of funds by wire or other means or involves one or more monetary instruments. *Garza*, 118 F.3d at 284.

Winter

Winter contends that the evidence presented at trial was insufficient to prove beyond a reasonable doubt that she conducted or attempted to conduct a financial transaction or that she engaged in the type of transaction that Congress intended to regulate. Winter maintains that the prosecution did not prove an actual delivery of $50,000 within the time frame alleged in the indictment. In addition, Winter asserts that her exchange of $7,000 for five pounds of methamphetamine, as described by Brusaw's testimony, is not a financial transaction. Winter also maintains that Congress intended to regulate only those transactions designed to conceal or disguise criminal proceeds, or the identity of participants. She argues that the prosecution failed to show that the transactions in question were designed in this manner. Furthermore, Winter argues that the prosecution did not "follow the money," both before and after the incident and therefore failed to demonstrate how the money affected interstate commerce. Winter also alleges

13

that the evidence is insufficient to prove that she attempted to conduct a financial transaction via Federal Express or via Western Union. Finally, Winter declares that her Constitutional rights were violated by the government's application of the money laundering statute against her. Specifically, she asserts that the money laundering statute's application to her activities was over-broad and therefore her Fifth Amendment substantive and procedural due process rights were violated.

## The government

The government states that the facts presented at trial overwhelmingly support the jury's guilty verdict for the money laundering conspiracy. The government contends that the evidence at trial proved that there were numerous interstate movements of large sums of currency and that the proceeds of the sale of methamphetamine were shipped from California to Texas. It asserts that the distribution channel between Texas and California would cease to exist if Winter and other individuals in Texas stopped delivering the payments. Moreover, the government maintains that the evidence established that the movement and transfer of these funds from Texas and California was pursuant to a pre-arranged agreement between various members of the conspiracy including: Winter, Campos, Carr, Charles Lawrence, Winter, Summers, Brusaw and others.

The government notes that the evidence at trial showed that Winter had been involved in the distribution of methamphetamine since the late 1980's. She was a member of the Social Club which supplied methamphetamine by Campos and Carr, and brought loads from California that were usually fronted for them. After each member had sold their portion of the methamphetamine, the monies were given to Charles Lawrence, who sent it to California to pay for the load. Winter received her portion of the drugs and allocated her share of the monies for the California payments. Moreover, the government focuses on Winter's employment at CL&C, which served as a major transfer location for the methamphetamine delivered from California. Through CL&C, she sent monies to California to pay for the loads received in Texas. In addition,

14

the government alleges that at one stage of the conspiracy she personally transported $50,000 to Campos in California and that on another occasion she provided $7,000 to Campos for the purpose of taking the money back to California. Winter also transferred by wire $4,800 to Summers to pay for methamphetamine in Texas. The government maintains that these transactions were taken by Winter in furtherance of the money laundering conspiracy and the drug conspiracy. Finally, the government asserts that there were numerous transactions which were reasonably foreseeable, especially regarding Winter who had a long standing role in the conspiracy.

Upon review of the record, we find that Winter's arguments are lacking in substance. The government presented a plethora of evidence at trial that sufficiently proved the elements of a money laundering conspiracy. Accordingly, we find that a jury could have reasonably found Winter guilty of a money laundering conspiracy based on either: (1) the financial transactions she engaged in; or (2) the transactions others performed in furtherance of both the money laundering conspiracy and the drug conspiracy.

### B. *Fatal variance*

#### Standard of review

In reviewing a variance claim, this Circuit has previously stated that "[w]e must affirm the jury's finding that the government proved a single conspiracy unless the evidence and all reasonable inferences, examined in the light most favorable to the government, would preclude reasonable jurors from finding a single conspiracy beyond a reasonable doubt." *United States v. Payne*, 99 F.3d at1280.

#### Analysis

Winter, Withee, Mark Lawrence, and Ridgeway assert that there was a fatal variance between the conspiracy alleged against in the indictment and the evidence of the conspiracy adduced at trial. "'A material variance occurs when a variation between proof and indictment occurs, but does not modify an essential element of the offense charged.'" *United States v. Dean*,

15

59 F.3d 1479, 1491 (5th Cir. 1995), *cert. denied*, 516 U.S. 1082 (1996) (quoting *Thomas*, 12 F.3d at 1357). This Court will not reverse a conviction for such a variance in evidence unless the Appellants prove: (1) a variance between the indictment and the proof at trial; and (2) that the variance prejudiced their substantial rights. *United States v. Morgan*, 117 F.3d 849, 858 (5th Cir.), *cert. denied sub nom. Ryan v. United States*, 118 S.Ct. 454 (1997).

In determining whether the government proved a single conspiracy as charged, three factors are examined: (1) whether there was a common goal; (2) the nature of the scheme; and (3) whether the participants in the various dealings overlapped. *United States v. Puig-Infante*, 19 F.3d 929, 936 (5th Cir.), *cert. denied*, 513 U.S. 864 (1994) (citing *United States v. Jackson*, 978 F.2d 903, 911 (5th Cir. 1992), *cert. denied*, 508 U.S. 945 (1993)).

Winter

Winter contends that although she was involved in a conspiracy that shared a common goal with the other conspiracy, the evidence is not determinative of her involvement in the conspiracy alleged in Count I of the indictment. First, she suggests that the "Lawrence Conspiracy" existed from 1990-1991 which is outside the time frame alleged in the indictment. Second, the participants were in the Lawrence Conspiracy were different. That conspiracy included: Winter, Charles Lawrence and Mark Lawrence. Moreover, unlike other defendants named in the indictment who competed for the same customers, Winter had her own clients. Finally, Winter asserts that the variance prejudiced her substantial rights because of the transfer of guilt to her from the numerous activities involving other persons unrelated to her.

Withee

Withee contends that the government failed to prove that he participated in the conspiracy alleged in the indictment. Withee, like Winter, argues that there is a fatal variance between the conspiracy alleged in the indictment and the proof at trial, which established the existence of two or more separate and independent conspiracies. In addition, Withee asserts that he was not part

16

of the conspiracy charged in the indictment because his involvement was limited to his purchasing of methamphetamine from a member of a larger conspiracy. Furthermore, he asserts that the evidence shows multiple conspiracies and that he was only part of a small conspiracy involving only Angela Beezer and himself.

## Mark Lawrence

Mark Lawrence alleges that the government constructively amended the indictment at trial by expanding the time frame of the conspiracy alleged in the indictment. Mark Lawrence alleges that the indictment charged him with conspiracy to distribute methamphetamine from April of 1992 through September 25, 1996. Mark Lawrence maintains that the evidence at trial showed that a conspiracy existed from the late 1980's through 1992 and that he was directly and intimately connected as a buyer, seller and user of the methamphetamine. Mark Lawrence asserts that the government proved and that the jury most likely convicted him of an offense that was not charged in the indictment. Furthermore, he states that the government could only prove that one of Mark Lawrence's acts was within the scope of the indictment.

Mark Lawrence contends that the government re-characterizes a constructive amendment of the indictment as a variance. Thus, he asserts that this Court should determine that the indictment was constructively amended and grant a reversal. He alleges that the essential elements of the crime are specific to: how long the agreement lasted, who participated in the agreement and what the purpose of the agreement was. Mark Lawrence portrays the facts of this case as two conspiracies: (1) the first conspiracy involved Mark Lawrence and the Social Club, which began in the 1980's and ended in 1992; and (2) the second conspiracy was the one formed after 1992. Mark Lawrence argues he was only involved in the first conspiracy, but that the government constructively amended the indictment by stretching its language "[f]rom at least 1992. . ." to include the "mid to late eighties."

## Ridgeway

Ridgeway, like the other Appellants, asserts that the government failed to prove a single

17

conspiracy, but instead offered testimony concerning the activities of two conspiracies: (1) the Campos conspiracy from April of 1992 to early 1994; and (2) the Beezer conspiracy from early 1995. Ridgeway maintains that there is a clear division between the two conspiracies. Moreover, Ridgeway maintains that the government alleged and only offered evidence to show that he purchased one pound of methamphetamine prior to Ian Beezer's arrest and right before the last overt act alleged. He argues that the evidence showed that the conspiracy ended just days after Ridgeway's purchase of the drugs. Ridgeway asserts that no evidence was offered to suggest his participation or knowledge of a conspiracy prior to February of 1995.

The government

The government asserts that the common goal of the charged co-conspirators was the purchase and sale of methamphetamine. The government notes that if the totality of the evidence demonstrates that all of the co-conspirators directed their efforts toward the accomplishment of a single goal or common conspiracy, then the existence of a single conspiracy may be found. *United States v. Elam*, 678 F.2d 1234, 1245 (5th Cir. 1972). In addition, the government points out that the fact that some of the participants may have changed over time does not effect the conclusion that the co-conspirators had a common purpose. *United States v. Maceo*, 947 F.2d 1191, 1196 (5th Cir. 1991), *cert. denied sub nom. Bauman v. United States*, 503 U.S. 949 (1992). Thus, the government asserts that although the defendants may have joined the conspiracy at different times they may still be validly convicted.

The government also contends that the co-conspirators actions contributed to the success of the scheme to buy and sell methamphetamine. The government maintains that with the exception of Mark Lawrence, the Appellants were mid-level distributors and the scheme would have failed or not been as successful if each Appellant did not play their role.

The government, with regard to the overlap of participants factor, argues that a single conspiracy can involve one pivotal figure who directs illegal activities while various combinations of other defendants further those activities in various ways at different times. *Elam*, 678 F.2d at

1246. The government asserts that Campos was a central supplier of the Appellants and they in turn furthered the conspiracy in different ways. Morever, the government contends that it is not a requirement that each and every member of the conspiracy know one another or be involved in every transaction. Thus, the government asserts that the argument that there could be no conspiracy as charged in the indictment merely because some participants and transactions were not directly linked with others is meritless.

The government states that if a variance existed, it would not be reversible error unless it prejudiced substantial rights. The government asserts that if it proves multiple conspiracies and a defendant is involved in at least one of them, then clearly there is no variance affecting the Appellants' substantial rights. The government notes that the evidence establishes that the Appellants were involved in a drug trafficking conspiracy with Campos and Ian Beezer.

This Court is not persuaded by the Appellants' arguments. Although each Appellant entered the conspiracy at a different time and contributed in various ways to this complex drug enterprise each one of them undoubtedly was focused on the same goal, the purchase and sale of methamphetamine. After reviewing the evidence presented at trial, we find that reasonable jurors jurors could have found beyond a reasonable doubt that each of the Appellants played an important role in furtherance of a single conspiracy. Accordingly, we hold that there was no fatal variance between the indictment and the evidence adduced at trial. Moreover, even if a variance could have been established, the variance did not prejudice the Appellants' substantial rights.

C. *Sentencing*

Standard of review

A sentence imposed under the Federal Sentencing Guidelines will be upheld on review unless it can be demonstrated that it was "imposed in violation of law; imposed as a result of incorrect application of the sentencing guidelines; or outside the range of the applicable sentencing guideline and is unreasonable." *United States v. Garcia*, 962 F.2d 479, 480-81 (5th Cir.), *cert. denied*, 506 U.S. 902 (1992). This Court affords great deference to the trial judge's

19

application of the sentencing guidelines. *United States v. Condren*, 18 F.3d 1190, 1193 (5th Cir.), *cert. denied*, 513 U.S. 856 (1994).

In examining the sentence imposed, we review the trial court's application of the sentencing guidelines *de novo. Crow*, 164 F.3d at 238. The district court's factual findings, for sentencing purposes, are reviewed under the clearly erroneous standard. *Millsaps,* 157 F.3d at 995.

1. *District court's findings regarding the amount of drugs to be included as relevant conduct pertaining to Winter*

Standard of review

The district court's finding, regarding the amount of drugs attributable to a defendant, will not be disturbed on appeal unless the finding was clearly erroneous. *United States v. Ramirez*, 145 F.3d 345, 358 (5th Cir.), *cert. denied*, 119 S.Ct. 602 (1998).

Analysis

"The base offense level under the Guidelines is determined by the quantity of drugs involved in the offense, and this quantity includes both drugs with which the defendant was directly involved, and drugs that can be attributed to the defendant in a conspiracy as part of his relevant conduct under the Guidelines." *United States v. Kelley*, 140 F.3d 596, 609 (5th Cir.) (internal quotations omitted), *cert. denied*, 199 S.Ct. 247 (1998). Pursuant to the United States Sentencing Guidelines, a defendant is liable for the amount of drugs reasonably foreseeable to him during the life of the conspiracy. *Ramirez*, 145 F.3d at 358 (citing U.S.S.G. § 1B1.3 ). Relevant conduct includes all reasonably foreseeable acts of others in furtherance of the conspiracy. *Kelley*, 140 F.3d at 609.

Winter

Winter argues that there is insufficient evidence to hold her responsible for 113 pounds of methamphetamine. Winter asserts that the three separate loads of methamphetamine attributed to her consisting of 95 pounds, 5 pounds, and 13 pounds are not supported by evidence.

The government

The government argues that Winter has been involved in the distribution of methamphetamine since the late 1980's. The government notes that Winter is one of three or four people who were involved in the conspiracy since its inception and during that time hundreds of pounds of methamphetamine were brought into Texas and sold. In addition, Winter moved with the drug operation, transported monies between Texas and California, and distributed methamphetamine in Texas.

The government notes that, based on the trial testimony and the conclusions and recommendation in the Presentence Report ("PSR"), the district court found by a preponderance of the evidence that the 113 pounds or 51 kilograms of methamphetamine were reasonably foreseeable to Winter. Furthermore, the district court stated that it found Winter actively involved in the conspiracy during the time period alleged in the PSR.

This Court agrees with the government's assertions. After reviewing the record, it is evident to this Court that Winter played an intricate and substantial role in the distribution of methamphetamine and that the 113 pounds were reasonably foreseeable to Winter during the life of the conspiracy. Accordingly, we AFFIRM the district courts decision to attribute the 113 pounds of methamphetamine to be included as relevant conduct.

2. *District court's findings as to relevant conduct and appropriate offense level for Withee*

Under the 1995 Sentencing Guidelines, a base offense level of 34 requires that a defendant be responsible for a least three kilograms but not more than ten kilograms of methamphetamine. U.S.S.G. §2D1.1(c)(3). If the quantity is one kilogram to three kilograms, the base offense level is 32. U.S.S.G. §2D1.1(c)(4).

On September 3, 1997, at the sentencing hearing for Withee, the district Court made the following findings:

All right. Thank you. Well – and I'm going to find based on the evidence I have

21

> before me, what it takes to get this level 34 is actually one kilogram, which is 2.2 pounds. I think the evidence puts the amount of drugs that Mr. Withee was involved in at least a kilogram based on the indicia of reliability, we're relying on the agent's testimony, the ledgers that were found as well as Ms. Beezer's testimony, so I'm going to overrule the objection, and I believe that he's probably at the level 34 as the probation officers calculates it.

Withee objected to the court's determination of the quantity of drugs at eleven pounds and instead suggested that he was only responsible for no more than two to three pounds. It appears that the district court found that it takes one kilogram to get to a level 34 base offense level and that the evidence showed that Withee was responsible for that amount. In addition, the district court found that Withee was entitled to a two-level adjustment for being a minor participant, thus reducing the offense level to 32. Thus, the applicable sentencing range was 121 months to 151 months and Withee was sentenced to 121 months.

### Withee

Withee contends that the district court erred in its determination of the proper offense level for the amount of drugs reasonably foreseeable by Withee. He asserts that, under the district court's determination that he was responsible for "at least one kilogram," his offense level should have been 32. Withee also states that with an additional two level reduction for minimal participation, his offense level should have been 30. Therefore, he concludes that the sentencing range should have only been between 97-121 months.

### The government

The government maintains that there was a factual dispute at the hearing which focused on whether Withee should have been held accountable for two or eleven pounds of methamphetamine. The government acknowledges that the district court's findings are contradictory. The district court found Withee accountable for approximately 11 pounds of methamphetamine. The district court, however, only discussed the reliability of one kilogram. Therefore, the government contends that there was confusion created by the various holdings and it recommends that this issue be remanded.

This Court agrees with the parties that the district court was not clear in its various

22

determinations. Accordingly, we REMAND to the district court for clarification on its findings as to relevant conduct and the appropriate offense level in regard to Withee.

3. *District court's finding that Ridgeway did not qualify for an offense level reduction under U.S.S.G. § 3B1.2*

Standard of review

A district court's findings that a defendant was not a minor participant in an offense will be upheld by this Court unless clearly erroneous. *United States v. Hare*, 150 F.3d 419, 427 (5th Cir. 1998) . Furthermore, clear error does not result if the finding is plausible in light of the record as a whole. *United States v. Parker*, 133 F.3d 322, 329-30 (5th Cir.), *cert. denied*, 118 S.Ct. 1851 (1998).

Analysis

In order to be a minor participant entitled to a reduction in offense level under U.S.S.G. §3B1.2, Ridgeway must have shown that he was substantially less culpable than the average participant. *Hare*, 150 F.3d at 427. Thus, a minor participant is one who is less culpable than most other participants, but whose role could not be described as minimal. *United States v. Becerra*, 155 F.3d 740, 757 (5th Cir. 1998). "This section does not apply whenever a defendant is, to a lesser degree, less culpable than his co-conspirators." *United States v. Edwards*, 65 F.3d 430, 434 (5th Cir. 1995). Moreover, the guidelines itself states that this section should be used infrequently. U.S.S.G. § 3B1.2, comment 2. "The defendant's participation must be 'enough less so that he at best was peripheral to the advancement of the illicit activity.'" *United States v. Tremelling*, 43 F.3d 148, 153 (5th Cir.), *cert. denied*, 514 U.S. 1122 (1995) (quoting *United States v. Thomas*, 932 F.2d 1085, 1092 (5th Cir. 1991), *cert. denied*, 502 U.S. 1038 (1992)).

Ridgeway

Ridgeway contends that the district court clearly erred in finding that he was not a minor participant in the conspiracy. Ridgeway asserts that at the sentencing proceedings his counsel established that his role within a massive conspiracy was only minor and that he provided truthful

23

information to the government.  Moreover, Ridgeway maintains that he was barely involved in the conspiracy when compared to the other defendants.  Ridgeway states that the government's witnesses testified that they had provided him with only a pound of methamphetamine.  However, three years prior to Ridgeway's involvement the witnesses admitted to distributing hundreds of pounds of drugs.

### The government

The government argues that when the record is viewed as a whole, it is evident that the district court did not clearly err in determining that U.S.S.G. § 3B1.2 did not apply to Ridgeway. The government notes that the district court found that Ridgeway was involved in the distribution of approximately four pounds of methamphetamine, a quantity that would not put him on the "bottom end" of  this conspiracy.  Therefore, the government argues that the district court was correct in holding that Ridgeway's involvement was not so peripheral to warrant a reduction of his sentence.

We agree with the government's contentions.  This Court finds that Ridgeway failed to demonstrate that he was substantially less culpable than the average participant.   In addition, Ridgeway did not show that his participation was at merely peripheral to the advancement of the methamphetamine drug conspiracy.  Accordingly, we hold that the district court did not err by determining that Ridgeway was not a minor participant in the offense under § 3B1.2.

4. *District court's imposition of a fine as to Lang*

### Standard of review

Where the defendant challenging the district court's action fails to make an objection to the court, we review that issue for plain error.  *See United States  v. Hernandez-Guevara*, 162 F.3d 863, 870 (5th Cir. 1998).  "Reversal for plain error is only appropriate where the alleged error was obvious, substantial and, if not corrected, would seriously affect the fairness, integrity, or public reputation of judicial proceedings."  *Marceaux v. Conoco, Inc*., 124 F.3d 730, 734 (5th

24

Cir. 1997) (internal quotations omitted).

Analysis

"[S]pecific findings are necessary if the court adopts a PSR's findings, but then decides to depart from the PSR's recommendation on fines or cost of incarceration." *United States v. Fair*, 979 F.2d 1037, 1040 (5th Cir. 1992); *see United States. v. Hodges*, 110 F.3d 250, 251 (5th Cir. 1997). "When a sentencing court adopts a PSR which recites facts showing limited or no ability to pay a fine the government must then come forward with evidence showing that a defendant can in fact pay a fine before one can be imposed." *Fair*, 979 F.2d at 1041; *see Hodges*, 110 F.3d at 251. The trial court should give its reasons for departing from the PSR's recommendations on fines and costs of incarceration. *Fair*, 979 F.2d at 1041; *see Hodges*, 110 F.3d at 251.

Lang

Lang contends that the district court did not comply with the procedures mandated by *Fair* and *Hodges*. Lang notes that the district court assessed a fine without stating any reasons or making any specific findings even though it adopted the PSR's findings.[8] In addition, Lang states that the government failed to introduce evidence addressing the PSR's conclusion that Lang was not financially able to pay a fine. Therefore, Lang contends that under *Fair* and *Hodges*, the fine should be vacated and the case remanded to the district court for reconsideration.

The government

The government admits that the district court should have made specific findings of fact for the imposition of the fine as established by *Fair* and *Hodges* and that the government failed to present evidence in support of a fine. The government notes that the issue of a fine arose in the

---

[8]The PSR pertaining to Lang stated that the defendant "is presently incarcerated and has no income. It appears he is unable to pay a fine in this case. The defendant's assets should be used to support his wife and son. The defendant also has an outstanding debt of $14,000 to the Internal Revenue Service."

25

sentencing hearing.  Nevertheless, the government contends that because Lang failed to object at trial to the imposition of the fine, this issue must be reviewed for plain error only.  Furthermore, the government asserts that Lang never argued that the fine impaired his substantial rights.  Finally, the government argues that the district court imposed the smallest fine allowed and could impose the same sentence again with the appropriate findings of fact.

We hold that the district court improperly imposed a fine upon Lang because he is financially unable to comply with its requirements.  In addition, this Court concludes that the district court failed to comply with *Fair* and *Hodges* by imposing the fine without a proper explanation.  Therefore, we hold that the district court committed plain error by ignoring the PSR and by failing to state its rationale behind the imposition of the fine.  Moreover, the district judge's failure to articulate the reason for the imposition of the fine seriously affects the fairness and integrity of judicial proceedings.  Accordingly, we REVERSE the district court's decision and VACATE the imposition of the fine.

5. *District court's denial of Winter's acceptance of responsibility*

Standard of review

Where the defendant challenging the district court's action fails to make an objection to the court, we review the issue review that issue for plain error.  *See Hernandez-Guevara*, 162 F.3d at 870.  "Reversal for plain error is only appropriate where the alleged error was obvious, substantial and, if not corrected, would seriously affect the fairness, integrity, or public reputation of judicial proceedings."  *Marceaux*, 124 F.3d at 734 (internal quotations omitted).

Analysis

U.S.S.G. § 3E1.1 provides:

(a)     If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels.

(b)     If the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level 16 or greater, and the defendant has assisted authorities in the investigation or prosecution of his own misconduct by taking one or more of the following steps:

26

(1)	timely providing complete information to the government concerning his own involvement in the offense; or

(2)	timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently,

decrease the offense level by 1 additional level.

### Winter

Winter claims that she is entitled to a reduction in her base offense level due to her acceptance of responsibility. Winter contends she is entitled to a three-point reduction under § 3E1.1 based upon a statement she made prior to trial.[9]

### The government

The government maintains that the PSR properly suggested the denial of a reduction of Winter's base offense level based upon acceptance of responsibility. The government notes that the PSR states that "the defendant put the government to its burden of proof at trial by denying essential factual elements of guilt. The probation officer has no information that the defendant accepted responsibility for her offense prior to proceeding to trial." The government also asserts that Winter's only statement was to the probation officer after trial stating "I disagree with the verdict." In addition, the government argues that Winter did not demonstrate in anyway acceptance of responsibility. Thus, the government concludes that no error, let alone plain error, was committed by the district court by denying Winter a two level reduction of her offense level based upon acceptance of responsibility.

After reviewing the record, we find that Winter's admission to Agent Shanks does not constitute an acceptance of responsibility by Winter for her offense. This adjustment is usually

---

[9]Winter notes that IRS Agent Shanks testified that prior to trial "[Winter] admitted to sending Western Unions to us [the IRS] when we interviewed her." Also, she points to the fact that the PSR states that "the probation officer relied on information obtained from Special Agents Vaughn and Shanks, the indictment, the plea agreement [sic], and the defendant," however, no adjustment was made for acceptance of responsibility.

not granted "to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt. . . ." U.S.S.G. § 3E.1.1, comment 2. Clearly, Winter failed to admit essential factual elements of guilt regarding the drug conspiracy and the money laundering conspiracy, and thus, the government had to meet its burden of proof. Therefore, we find that Winter's admission cannot be rewarded under U.S.S.G. § 3E.1.1 because she failed to reveal her involvement in the charged offenses. Accordingly, hold that the district court did not err by denying Winter a deduction in her offense level.

### D. District court's use of the standard jury instruction on money laundering.

#### Standard of review

We review a district court's refusal to give a proposed jury instruction for an abuse of discretion. *United States v. De Leon*, 170 F.3d 494, 498 (5th Cir. 1999) (citing *United States v. Garcia Abrego*, 141 F.3d 142, 153 (5th Cir.), *cert. denied*, 119 S.Ct. 182, 142 (1998).

#### Analysis

This Court, in reviewing a jury instruction, must determine whether "the court's charge as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them." *United States v. Mann*, 161 F.3d 840, 865 (5th Cir. 1998), *cert. denied*, --- S.Ct. ----, 1999 WL 231307 (1999). "Reversal of the district court's refusal to give the proposed jury instructions is appropriate only if the rejected instruction (1) is substantively correct; (2) is not substantially covered in the charge given; and (3) pertains to an important point in the trial such that failure to give the instruction impairs the defendant's ability to present a given defense effectively." *De Leon*, 170 F.3d at 498.

#### Winter

Winter argues that she requested that the following be deleted from the standard jury charge: "If you decide that there would be any effect on interstate commerce, then that is enough to satisfy the element. The effect can be minimal." Winter contends that these two sentences

contradict prevailing law, in particular there must be more than a *de minimis* effect on interstate commerce. Furthermore, she contends that the jury charge is contrary to

Congressional intent. Winter also asserts that the jury charge, as a whole, did not properly instruct the jury.

The government

The government maintains that the district court's charge adequately instructed the jury on all of the elements of a money laundering conspiracy. The government notes that the court's charge defined the terms of the transaction, financial transaction, monetary instruments, unlawful activity and effect on interstate commerce. Moreover, the government asserts that the court's charge defined a money laundering conspiracy under 18 U.S.C. § 1956(h) and then directed the jurors to refer back to the earlier portion of the charge for the general law of conspiracy. Furthermore, the government maintains that the jury instructions defined the correct prong of §1956. The government responds to winter's argument regarding the effect on interstate commerce by stating that the charge correctly informed the jury that while the government must demonstrate an interstate impact of the money laundering, that impact may be minimal. *United States v. Westbrook*, 119 F.3d 1176, 1192 (5th Cir. 1997), *cert. denied sub nom. Peoples v. United States*, 118 S.Ct. 1059 (1998). Moreover, after *United States v. Lopez*, 514 U.S. 549 (1995), courts have recognized that this *de minimis* standard continues in effect. *Westbrook*, 119 F.3d 1191-92. Thus, the government concludes that the district court did not abuse its discretion by denying Winter's request to instruct the jury as she requested as to the money laundering offense and by referring the jury to the court's charge for a definition of money laundering.

This Court finds that Winter's contentions are misplaced. The jury instruction does not contradict prevailing law or run afoul of Congressional intent. Moreover, the district court's charge adequately instructed the jury on the elements of a money laundering conspiracy. Accordingly, we hold that the district court did not abuse its discretion by denying Winters

29

requested instruction.

E. *District court's ruling on Ridgeway's objections and its decision to admit the evidence of the Irving drug transaction*

Standard of review

This Court reviews a district court's evidentiary ruling for abuse of discretion. *De Leon*, 170 F.3d at 497.

Analysis

Extrinsic evidence was admitted during the course of the trial. Extrinsic evidence may be introduced to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *See* FED. R. EVID. 404(b). The admission of evidence under Federal Rule of Evidence 404(b) calls for is essentially a two-step test: (1) it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character; and (2) the evidence must possess probative value that is not substantially outweighed by its undue prejudice. *Hernandez-Guevara*, 162 F.3d at 870.

Ridgeway

Ridgeway asserts that the government offered evidence to show a conspiracy which concluded in February of 1995, when the conspirators could no longer obtain methamphetamine due to Beezer's arrest. Ridgeway contends that he never knew or participated in the conspiracy until 1995. In addition, Ridgeway maintains that the government offered evidence that Ridgeway was arrested by the Irving Police Department on March 30, 1996 for possession of methamphetamine and was found with other drug paraphernalia. However, the amount of methamphetamine was too insignificant to charge him of possession with intent to distribute. Ridgeway notes that he objected to proof of the extraneous offense on relevancy grounds, but the court rejected those objections. Ridgeway asserts that the admission of evidence of the Irving drug transaction was not harmless and had a substantial negative impact on the jury.

The government

The government claims that Ridgeway's case focused on his supposed lack of knowledge

30

and intent. The government notes that whenever intent and knowledge are in any way contested, evidence tending to show knowledge is admissible. *United States v. Anderson*, 933 F.2d 1261, 1268 (5th Cir. 1991). The government claims that this holds true in this case because Ridgeway asserts he was simply a passive participant and was unaware of what was transpiring. In addition, the government notes that as a general rule, evidence of similar acts predicating a narcotics offense is admissible. The government also argues that this evidence encompasses the existence and purpose of the narcotics partnership as well as the significance of later behavior. Furthermore, the government agrees with the district court that the evidence of the Irving drug transaction was relevant to demonstrate matters other than Ridgeway's character and that it was more probative than prejudicial. Moreover, the government maintains that the Irving drug transaction involved the same drugs as the conspiracy and was within the time frame of the conspiracy charged in the indictment. Thus, the government argues that the evidence could be considered intrinsic to the conspiracy.

This Court agrees with the government's assertions. Indeed, Ridgeway's lack of knowledge and intent were at issue. The district court properly allowed the admission of evidence of the Irving drug transaction because it was relevant to show circumstances beyond Ridgeway's character and its probative value clearly outweighed its prejudicial effect. Accordingly, we hold that the district court did not abuse its discretion by overruling Ridgeway's objections and admitting evidence of the Irving drug transaction.

F. *Ineffective assistance of counsel*

Standard of review

This Circuit generally does not allow claims for ineffective assistance of counsel to be resolved on direct appeal when those claims have not been presented before the district court since no opportunity existed to develop the record. *United States v. Haese*, 162 F.3d 359, 363 (5th Cir. 1998), *petition for cert. filed*, (April 15, 1999) (No. 98-9005). Moreover, this Court does not typically review these claims on direct appeal because the record is rarely sufficiently

31

developed on the issue of attorney competence. *Id.* Accordingly, the record must allow us to evaluate fairly the merits of the claim. *United States v. Navejar*, 963 F.2d 732, 735 (5th Cir. 1992).

Analysis

Only after this Court determines that the record is sufficiently developed will we address Winter's claim for ineffective assistance of counsel. *Haese*, 162 F.3d at 363. If the record is sufficiently developed, then, we must determine if Winter's attorney's performance rises to the level of ineffective assistance. *See id.* In order for Winter to demonstrate that she has a valid claim, justifying the reversal of her conviction, she must prove both prongs of the *Strickland* test. First, Winter must show that her counsel's performance was deficient. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "This requires showing that the counsel made errors so serious that counsel was not functioning as 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* "Second, the defendant must show the deficient performance prejudiced the defense." *Id.*

In explaining the first prong of the *Strickland* test, that counsel's assistance was deficient, under prevailing norms, we must determine "whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955).

Even if Winter can show that her counsel's assistance was deficient, she must still prove the second prong of the *Strickland* test, prejudice. To prove prejudice, Winter "must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Pratt v. Cain*, 142 F. 3d 226, 232 (5th Cir. 1998) (quoting *Strickland*, 466 U.S. at 694). A "reasonable probability" is a probability to undermine confidence in the outcome of the proceeding. *Id*. Thus, the second prong focuses on whether

32

counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

## Winter

Winter contends that she received ineffective assistance from her trial counsel and that this Court should address this issue on direct appeal. In particular, Winter claims that she has a valid claim for ineffective assistance of counsel because her attorney failed to raise all of the possible objections during her sentencing hearing.

## The government

The government asserts that this Court should decline to review Winter's allegations of ineffective assistance of counsel because these issues were not raised before the district court. Moreover, the government asserts that the issues raised by Winter do not fall within the rare category of cases which permit a fair review by this Court on direct appeal.

Upon review of the record, this Court holds that the record is insufficiently developed to allow us to properly address on direct appeal Winter's claim for ineffective assistance of counsel. Therefore, we decline to review this allegation because a fair evaluation of the claim cannot be conducted.

### G. *Allen charge and denial of the motion for mistrial.*

## Standard of review

The standard of review for a challenge to the use of an *Allen*[10] charge is abuse of discretion. *United States v. Lindell*, 881 F.2d 1313, 1320 (5th Cir. 1989), *cert. denied*, 496 U.S. 926 (1990).

## Analysis

---

[10]"The phrase '*Allen* charge' refers to supplemental jury instructions that urge deadlocked juries to forego their differences in order to reach a unanimous verdict. The original *Allen* charge urged the minority of the jury to consider the views of the majority in an effort to determine whether the minority views were reasonable under the circumstances." *Montoya v. Scott*, 65 F.3d 405, 409 n. 3 (5th Cir. 1995), *cert denied*, 517 U.S. 1133 (1996) (quoting *Boyd v. Scott*, 45 F.3d 876, 882 (5th Cir. 1994), *cert. denied*, 514 U.S. 1111 (1995)).

In reviewing an *Allen* charge, this Court must scrutinize its compliance with two requirements: (1) the semantic deviation from approved "*Allen*" charges cannot be so prejudicial to the defendant as to require reversal; and (2) the circumstances surrounding the giving of an approved "*Allen*" charge must not be coercive. *Scott*, 65 F.3d at 409.

The district court was informed that the jury had reached a verdict regarding five of the defendants, but was deadlocked as to Lang by 11 to 1. The district court then brought the jury into the courtroom and asked the foreman if further deliberations would result in a verdict. The foreman responded "we're pretty – the other juror is pretty – had some real problems." When asked the chances of reaching a verdict, the foreman replied "very slim" and the other jurors agreed. The district court stated "I don't want you to deliberate if its going to be futile. Obviously we'd like to get to a verdict either way, because it brings finality to the case, but on the other hand there is no point in wasting anybody's time."

The court overruled Lang's objection, who stated that the *Allen* charge was impermissibly coercive. The district court then proceeded with the standard *Allen* charge. In response to Lang's objections, the district court stated:

> I don't think the charge tells them that, that because of the numbers you need to change your mind. The original charge also tells them you shouldn't reach a verdict merely for the convenience or purpose of reaching a verdict. No one is to change their vote. It gives them additional instructions, informs them what happens.

Thereafter, the district court inadvertently stated that the burden of proof was a "preponderance of the evidence," but when informed of the error, it immediately corrected the mistake and gave the correct burden of proof. The court refused to grant a mistrial based on this mistake. The court's charge stressed to the jurors that they were not expected to yield a conscientious conviction, but return a verdict if they could do so without surrendering their conscientious conviction. Finally, the district court explained to the jury that "[s]ome jurors aren't aware of what happens if there is a hung jury, and the purpose of that instruction is to let you know and make you aware of that."

34

As the jury was being excused from the courtroom, the judge said to the foreman, "Go for a little while longer Mr. Peters, and then if it looks like there's no movement or if you don't think there's much of a chance of any change, then let the Marshall know. Then we will take it from there." The jury returned in just under an hour with a verdict of guilty as to all of the defendants, including Lang.

### Lang

Lang argues that the district court erred in giving an unmodified *Allen* charge and refusing to grant a mistrial. He asserts that the *Allen* charge was unfairly coercive because the court knew the jury was divided 11-1 for conviction and the jury knew that the court was aware of that division. In addition, Lang asserts that the court's inadvertent misstatement of the burden of proof made the *Allen* charge improper.

### The government

The government contends that trial court did not abuse its discretion by giving the *Allen* charge and by denying Lang's motion for mistrial. The government maintains that the district court explained to the jury the purpose of the *Allen* charge, it repeatedly cautioned the jury not to agree for the sake of reaching a verdict, and it gave final instructions to jury as they exited the courtroom.

This Court concludes that the government's contentions are correct. We find that the *Allen* charge was not unfairly coercive. In addition, we note that although the court made a mistake in stating the incorrect burden of proof, it quickly remedied its error and instructed the jury on the proper burden of proof. Accordingly, we hold that the district court did not abuse its discretion nor coerced a verdict by giving an *Allen* charge, and did not err by denying a mistrial.

### III. CONCLUSION

This Court holds that the evidence presented at trial is sufficient to support the jury's verdicts of guilty against all of the Appellants under Count I and to Winter under Count II. Also, we conclude that a fatal variance did not exist between the conspiracy alleged against the

35

Appellants in the indictment and the evidence of conspiracy adduced a trial. This Court declines to address on direct appeal Winter's claim for ineffective assistance of counsel. We AFFIRM the district courts findings and decisions in regard to Winter: (1) in the amount of drugs included as relevant conduct; (2) the denial of her request for a downward departure based upon acceptance of responsibility; and (3) in the district court's use of the standard jury instruction for money laundering. In addition, we AFFIRM the district court and find that it did not abuse its discretion or coerced a verdict by giving an *Allen* charge nor erred by denying Lang's motion for mistrial. Furthermore, we hold that the district court did not abuse its discretion by admitting into evidence of the Irving drug transaction and we AFFIRM its finding that Ridgeway was not a minor participant in the offense under U.S.S.G. § 3B1.2. This Court REMANDS to the district court for clarification the issue of its findings as to relevant conduct and the appropriate offense level for Withee. In addition, we hold that the district court committed plain error in its decision to impose a fine against Lang, therefore we REVERSE its decision and VACATE the imposition of the fine.